**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| IN RE:<br><br>Don Karl Juravin,<br><br>     Debtor. | CASE NO.: 6:18-bk-06821-KSJ<br><br>CHAPTER 7 |
| Federal Trade Commission,<br><br>     Plaintiff,<br><br> v.<br><br>Don Karl Juravin,<br><br>     Defendant. | ADV. NO.: 6:19-ap-00030-KSJ |

**FEDERAL TRADE COMMISSION'S WRITTEN CLOSING ARGUMENT**

Trial on Complaint to Determine Non-Dischargeability of Debt
Trial Dates:  June 25-26, & August 17-18, 2020

**TABLE OF CONTENTS**

I.    PROCEDURAL HISTORY ............................................................................. 1

II.   FACTS PROVEN AT TRIAL .......................................................................... 3

    A.    Undisputed Facts Elicited From Defendant's Witness, Mr. Choksi ............................ 5

    B.    Irrelevant Testimony From Defendant's Witnesses:  Dr. Free, Ms. Laporte, and Ms. Ullola........................................................................................................................ 5

    C.    Testimony Establishing Intentional Fraudulent Conduct by Juravin ........................... 6

        i.    Juravin's Control Over Product Claims ................................................................ 7

        ii.   Juravin's Substantiation Consisted of Nothing More Than Unrecorded Anecdotes and Conjecture, and He Knew It. ........................................................ 10

        iii.  Juravin Knew Testimonials Posted on Roca Labs' Websites Included Videos From Paid Actors and A "Success Coach." ....................................................... 22

        iv.   Juravin Purposefully Did Not Disclose Gastricbypass.me Was Owned By Roca Labs. ....................................................................................................... 25

        v.    Consumers Were Not Required to Read The Terms and Conditions Pages on Roca Labs' Websites Prior to Purchase ........................................................... 27

    D.    Juravin Is Not Credible. ....................................................................................... 34

III.  JURAVIN INTENDED TO DECEIVE CONSUMERS SO THE FTC'S DEBT SHOULD BE EXCEPTED FROM DISCHARGE. .......................................................... 35

    A.    Juravin Knowingly Made False, Misleading, or Unsubstantiated Claims About Roca Labs' Products. ........................................................................................... 38

    B.    Juravin Approved Roca Labs Use of Testimonial Videos Recorded by Persons Who Had Undisclosed Financial Relationships With Roca Labs. ...................................... 42

    C.    Juravin Intentionally Did Not Disclose That He Owned and Operated Gastricbypass.me. ............................................................................................... 45

    D.    Roca Labs Products Purchasers Did Not Affirmatively Agree To Pay The Difference Between A Purported "Discount" Price And A Purported "Full Price" If They Posted Negative Product Comments or Reviews. ................................................................ 46

IV.   CONCLUSION ......................................................................................... 48

# **TABLE OF AUTHORITIES**

**Cases**

*Conseco v. Howard (In re Howard)*, 261 B.R. 513, 517 (Bankr. M.D. Fla. 2001) ............... 35, 48

*Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir. 1994).................... 35, 37, 41

*FTC v. Ettus (In re Ettus)*, 596 B.R. 405, 412 (Bankr. S.D. Fla. 2018)................................ 36, 37

*FTC v. Rensin (In re Rensin)*, 597 B.R. 177, 186 (Bankr. S.D. Fla. 2018) ................................ 36

*FTC v. Roca Labs, Inc., et al.*, 345 F. Supp. 3d 1375 (M.D. Fla. 2018).............................. *passim*

*HSSM #7 Ltd. P'ship v. Bilzerian (In re Bilzerian)*, 100 F.3d 886 (11th Cir. 1996)................... 37

*In re Laskey*, 441 B.R. 853, 856 (Bankr. N.D. Ohio 2010) ........................................... 37

*In re Sears*, 533 F. App'x 941, 945 (11th Cir. 2013)............................................ 37, 48

*Kolb v. Bentley (In re Bentley)*, 599 B.R. 369, 384 (Bankr. M.D. Fla. 2019) ............................ 36

*SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998)................................ 36

*Smith v. Cravey (In re Cravey)*, 105 B.R. 700 (Bankr. M.D. Fla. 1989)...................................... 35

*J. Thompson Invs., LLC v. Soderstorm (In re Soderstrom),*

524 B.R. 835, 841 (Bankr. M.D. Fla. 2015) .................................................................... 35, 36, 41

**Statutes**

15 U.S.C. §§ 45(a), 52 ................................................................................................. 2

11 U.S.C. § 523(a)(2)(A) ................................................................................ 1, 3, 41, 48

At the completion of the trial of this proceeding, focused solely on Debtor/Defendant Don Karl Juravin's ("Juravin") intent to deceive under Section 523(a)(2)(A), it is evident that he intended to deceive consumers in marketing and selling the Roca Labs products between 2011 and 2015. Juravin chose to make claims that he knew were not true, or for which he knew he had no demonstrable support. Whether this Court finds Juravin actually intended to deceive consumers, or that he recklessly disregarded whether his claims were true or false, the result is the same: the FTC's monetary judgment is excepted from discharge in this bankruptcy. The FTC's evidence has established: that Juravin knew what claims were made about Roca Labs' products (he approved them) and when; that he did not have support for those claims, much less the stated level of support for the claims; that he continued to use "testimonials" from individuals paid by Roca Labs while not disclosing that fact to prospective customers; that he created an "independent" website whose relationship to Roca Labs was hidden, but which served solely to promote Roca Labs; that he attempted to bind customers to a gag clause using buried terms; and that he profited handsomely from this enterprise. In his defense, Juravin provided no evidence to rebut the FTC's proof, and his testimony regarding his intent simply was not credible. Juravin did establish one thing: no matter how his words and statements are presented – through oral examination where his counsel was present, or in written responses issued through counsel – in Juravin's view, those words do not actually mean what they so clearly state. This is the siren song of every duplicitous debtor, not that of an honest but unfortunate debtor whose debt should be discharged.

## I.    PROCEDURAL HISTORY

In September 2015, the FTC brought an enforcement action against Juravin and several of his co-defendants for deceptive and unfair business practices in connection with advertising

and selling dietary supplements, in violation of Sections 5(a) and 12 of the FTC Act.  15 U.S.C. §§ 45(a), 52.  *FTC v. Roca Labs, Inc.,* No. 8:15-cv-02231-MSS-TBM (M.D. Fla.) (the "Enforcement Action").  On September 14, 2018, the District Court ruled in the FTC's favor finding Juravin and his corporate co-defendants violated the FTC Act.  *FTC v. Roca Labs, Inc., et al.*, 345 F. Supp. 3d 1375 (M.D. Fla. 2018).  Subsequently, on January 4, 2019, the District Court entered a judgment against Juravin and his corporate co-defendants, including equitable monetary relief in the amount of $25,246,000.  Adversary Complaint, Ex. A (Adv. ECF No. 1-1 (Dist. Ct. ECF No. 241)).  The judgment and liability rulings entered in the Enforcement Action cover Juravin's conduct between 2011 and 2015 (hereinafter, the relevant period).  *Roca Labs*, 345 F. Supp. 3d at 1399; Adversary Complaint, Ex. A at 3 and n.3 (Adv. ECF No. 1-1 (Dist. Ct. ECF No. 241)).

On October 31, 2018, Juravin filed a petition for relief with this Court under Chapter 7 of the Bankruptcy Code[1] (Voluntary Petition, ECF No. 1).  In September 2019, Juravin requested and the Court granted permission to convert his case to one under Chapter 11 (Order Converting Case from Chapter 7 to Chapter 11, ECF No. 174).  After sustaining objections to Juravin's Plan and Disclosure Statement, this Court converted the case back to a Chapter 7 proceeding March 13, 2020 (Order Denying Confirmation of Debtor's Amended Chapter 11 Plan and Re-Converting this Case to a Chapter 7 Case, ECF No. 317).

Meanwhile, on February 2, 2019, the FTC filed its Complaint to Determine Nondischargeability of Debt against Juravin, thereby initiating this Adversary Proceeding (ECF No. 1).  The FTC filed a motion for summary judgment (ECF Nos. 15-17), arguing that collateral estoppel prohibited re-litigation of the facts established in the Enforcement Action, thereby

---

[1]  All references to the Bankruptcy Code are to 11 U.S.C. § 101, *et. seq.*

warranting a judgment excepting the FTC's judgment from discharge.  Juravin opposed the

FTC's summary judgment motion only as to the element of intent to deceive under 11 U.S.C.

§ 523 (a)(2)(A) (ECF No. 22).  On March 20, 2020, this Court granted in part, and denied in part

the FTC's summary judgment motion (Order Partially Granting and Partially Denying Plaintiff's

Motion for Summary Judgment, ECF No. 34 (the "MSJ Order")).  In the MSJ Order, the Court

held:

> The parties agree the principles of *res judicata* and collateral estoppel
> prevents re-litigation of all elements except the Debtor's intent to deceive.  The
> Court holds that a partial summary judgment is appropriate on all elements of
> Section 523(a)(2)(A) except whether the Debtor acted with the intent to deceive.
> Specifically, the District Court Judgment finally determines that the Debtor made
> a false representation, the customers relied on the misrepresentation, the reliance
> was justified, and the loss was quantified at $25,246,000.  The only remaining
> issue is whether Debtor made these misrepresentations intending to deceive.

Adv. ECF No. 34 at 6.  Ultimately, the Court ruled that Juravin "may have his day in Court on

this sole remaining issue – whether he acted intending to deceive his customers."  *Id.* at 7.

The Court presided over a trial on the single remaining issue beginning on June 24, 2020.

On June 25, 2020, the Court heard testimony from two of Juravin's witnesses, Mr. Tejas Choksi

and Dr. Marcus Free.  Due to issues related to the availability of the interpreter Juravin

requested, the Court reconvened the trial to hear testimony from Juravin on August 17-18, 2020.

The trial concluded on the 18th with parties to submit closing arguments in writing by September

18, 2020.

## II.    FACTS PROVEN AT TRIAL

In support of its case, the FTC submitted documentary evidence, and witness testimony

in the form of prior deposition testimony from three individuals:  Sharon King, Sharon Hensley,

and Dr. Ross Finesmith.  Federal Trade Commission's Index of Deposition Designations (ECF

No. 61); King Deposition (ECF No. 61-1); Hensley Deposition (ECF No. 61-2); Finesmith

Deposition (ECF No. 61-3).[2]  In addition, the FTC counter-designated testimony to that offered

by Juravin in the deposition transcripts of Priscilla Laporte and Elizabeth Ullola (ECF Nos. 52-1,

52-2, respectively).  *See also* Plaintiff's Objections and Counter-Designations to Defendant's

Amended Statement of Deposition Designations (ECF No. 52).  The Court admitted into

evidence FTC Exhibits 3, 5 to 116, 118 to 121, and 124 to 163.  Trial Tr. 6/25/20 at 17:10-18;

Trial Tr. 8/18/20 at 61:7-19.  Admitted exhibits PX 134 to 137 include the transcripts of

deposition testimony from Juravin taken during the Enforcement Action.  Juravin's statements in

those transcripts are binding upon him here as admissions, or statements of a party opponent,

under Federal Rule of Evidence 801(d)(2)(B).

Since the FTC objected to the relevance of most of Juravin's witnesses, we have

addressed their testimony first, below, and separately from the merits of the case.  Although

Juravin's witness Mr. Tejas Choksi knew Juravin during the relevant period, Mr. Choksi's

testimony did not address any significant issues in dispute, nor did he offer many facts material

to Juravin's intent to deceive.  Next, all of the testimony offered from Dr. Marcus Free, Priscilla

Laporte, and Elizabeth Ullola is irrelevant because none of these individuals knew Juravin nor

were they involved with Roca Labs during the relevant period.  *See* Plaintiff's Objections and

Counter-Designations to Defendant's Amended Statement of Deposition Designations (ECF No.

52).  Lastly, we present the mountain of evidence that establishes Juravin's intent to deceive

consumers, discussed on a claim-by-claim basis.

---

[2] References to witness testimony submitted in the form of prior deposition testimony are abbreviated herein as, *e.g.*, King Tr. at __ (ECF No. 61-1).  Trial transcripts will be referred to herein by transcript date.  Thus, the June 25, 2020 proceedings will be identified as "Trial Tr. 6/25/20," the June 26, 2020 proceedings will be "Trial Tr. 6/26/20," and so on.  References to Plaintiff FTC's exhibits are to PX No. __.

### A. Undisputed Facts Elicited From Defendant's Witness, Mr. Choksi

In the June proceedings, Juravin called as a witness Mr. Tejas Choksi, who is an officer at Natural Vitamins Laboratories Corp. ("NVL").  Trial Tr. 6/26/20 at 48:19-21.  Mr. Choksi testified that during part of the relevant period[3], NVL manufactured supplements for Roca Labs.[4] Trial Tr. 6/26/20 at 57:3-6; 59:16-21.  Mr. Choksi stated that NVL is and was an FDA-registered manufacturing facility for supplements.  Trial Tr. 6/26/20 at 68:3-5.  Further, he admitted that when the ingredients for a product are mixed into supplements in an FDA-registered facility, that does not make the product FDA-approved.  Trial Tr. 6/26/20 at 68:3-10.  None of these facts were actually in dispute, nor do they provide any real evidence to support Juravin's defense or his denial of fraudulent intent.

In addition, Mr. Choksi testified that he provided to Juravin several references of places or individuals who could test the products NVL produced for Juravin.  Trial Tr. 6/26/20 at 67:6-16.  Those tests might have served as substantiation for Juravin's claims about Roca Labs products.  These facts bear on Juravin's intent to deceive as they establish Juravin was provided resources and contacts with whom he could discuss and arrange the needed tests and scientific evidence to support his claims.

### B. Irrelevant Testimony From Defendant's Witnesses:  Dr. Free, Ms. Laporte, and Ms. Ullola

In addition, Juravin called Dr. Free, and designated portions of testimony from the depositions of Priscilla Laporte and Elizabeth Ullola.  However, none of these witnesses knew Juravin nor were they involved with Roca Labs during the relevant period.  In fact, each of them

---

[3] Mr. Choksi testified that he met Juravin sometime in 2013, and that NVL began producing supplements for him that year.  Trial Tr. 6/26/20 at 52:9-20; 59:16-20.

[4] All references, including in trial transcripts, to "Roca Labs" are to any or all of the following entities:  Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., Must Cure Obesity Co., Juravin, Inc., and Zero Calorie Labs, Inc.  *E.g.*, Trial Tr. 8/17/20 at 38:8-40:25.

met Juravin after 2015.[5]  Thus, the FTC maintains these witnesses do not offer any testimony

that tends to prove, or disprove any material facts at issue in this adversary proceeding.  *See*

Plaintiff's Objections and Counter-Designations to Defendant's Amended Statement of

Deposition Designations (ECF No. 52).

### C.  Testimony Establishing Intentional Fraudulent Conduct by Juravin

Through the documents, videos, transcripts, and live testimony elicited during trial,

Juravin's direction and control over the advertising and marketing content for Roca Labs'

products was apparent.  That control and personal involvement is important to the claims at issue

in this adversary.  First, as established by the District Court and at trial, Juravin did not have

support for the claims he chose to make about Roca Labs products.  Rather, Juravin relied on

anecdotes and surmise to support all of his claims about the safety and efficacy of Roca Labs'

products.  Second, as found by the District Court and proven at trial, Juravin scripted and posted

supposed video testimonials or "success stories" that were recorded by individuals who were

paid by Roca Labs – several of whom had never even used the products.  Third, at trial and in his

Enforcement Action deposition, Juravin admitted he also created a wholly separate website about

gastric bypass, which purported to offer an independent review of Roca Labs products, but did

not disclose that site (gastricbypass.me) was owned and operated by Roca Labs.  Lastly, the

evidence shows that Juravin knew consumers were not required to read the "terms and

conditions" for Roca Labs prior to completing their purchases.  Juravin claimed those terms

---

[5] *See* Laporte Tr. at 9:1-10:18 (ECF No. 52-1) (testifying she learned of Roca Labs' products
while working as a housekeeper for Juravin in 2016); Ullola Tr. at 10:8-10, 10:23-11:2 (ECF No.
52-2) (testifying that she first learned of Roca Labs' products through a Google search in
September 2016), and 32:7-33:7 (she only met Juravin through videos he posted online and
through messages exchanged on a messaging service); Trial Tr. 6/26/20 at 12:10-20, 13:4-9,
30:17-19 (Dr. Free testified that he became acquainted with Juravin when he applied to serve as
a medical director in 2017).

barred customers from posting negative reviews of the products. Juravin threatened those who did make negative comments with financial penalties or even a lawsuit. The need to minimize negative comments and stories of the products' inefficacy only furthered Juravin's ultimate goal: to sell more Roca Labs products to generate more revenue. In that endeavor he was successful – to the tune of over $25 million in four years, with approximately $7 million of that sum benefitting Juravin directly. *Roca Labs*, 345 F. Supp. 3d at 1400. None of these actions demonstrate conduct of an unknowing, innocent debtor. Rather, they show Juravin directed and controlled all aspects of the fraudulent conduct at issue, and that he knew he mislead consumers.

### i.    Juravin's Control Over Product Claims

As the Court noted at trial, the facts found by the District Court remain established facts in this adversary proceeding. Trial Tr. 8/17/20 at 42:7-13. Since this Court's focus is on "Juravin's involvement and intent," the FTC will not re-prove established facts but will instead excerpt the specific findings made by the District Court that relate to the different claims at issue in this adversary proceeding. Trial Tr. 8/17/20 at 42:25-43:4 (noting that the District Court findings are binding).

District Court findings relevant to these claims:

- "The FTC has established that Juravin knew of the material misrepresentations and either participated in the deceptive acts or had authority to control them. Juravin testified that anything that was on the site was his responsibility. Juravin controlled virtually every aspect of the Corporate Defendants' business, including marketing, websites, claim substantiation, expenditures, personnel, and lawsuits. Juravin also stated that he was in charge of daily operations and was 'responsible for all matters involving Roca Labs, including advertisements.'" *Roca Labs, Inc.*, 345 F. Supp. 3d at 1400 (citations omitted).[6]

---

[6] Hereinafter, for readability, the FTC has omitted all internal citations and references from the block quotes of the District Court's opinion.

Juravin ran the day-to-day operations at Roca Labs, including advertising and marketing. Trial Tr. 8/17/20 at 29:1-6; King Tr. at 37:5-17 (ECF No. 61-1) (Juravin approved advertising content). He has also admitted he was responsible for all of the claims made on the Roca Labs websites. Trial Tr. 8/17/20 at 34:20-24. In addition, Juravin wrote the scripts to be used during the "lab coat videos" – those recorded by actors dressed in white laboratory coats. Trial Tr. 8/17/20 at 45:2-11. The "lab coat videos" included explanations of how to use the Roca Labs products, who could use them, and that users did not face additional dietary restrictions. PX 75 (what is the formula), 78 (fat is unhealthy and ugly), 80 (no diet, no restrictions), 155 (FTC-PROD-004543) (safe for kids). For the video in PX 75, Juravin specifically approved the claims made in it and stated it was his idea for the actor in the video to wear a lab coat. Trial Tr. 8/17/20 at 45:12-46:16. The videos also included claims about how successful the products were, including that they were "scientifically proven to have a 90% success rate" and would "always achieve a gastric bypass effect." PX 76. One video even compared the products to gastric bypass surgery. PX 79, 155 (FTC-PROD-004294). The content of the videos mirrored the claims made on the Roca Labs websites. *See, e.g.,* PX 6-9, 15, 20-21, 45, 53-54, 56, 60-61, 64, 67, 84, 86, 88, 94-95, 106, 110.

During trial, Juravin did not come forth with any evidence to show someone else had the ability to override Juravin's directives over what claims were made, or how they were presented in text and video format. These facts are important because they establish fraud *in the selling and marketing* of the products, which was the basis for the claims in the Enforcement Action, and in Counts I to V of this adversary proceeding.[7]

_____

[7] Despite his claims to the contrary, Juravin knew about negative comments from customers, or he would not have hired a lawyer to draft a threatening letter. *See* PX 161 (Ex. C); Trial Tr. 8/17/20 at 145:20-24 (claiming his attorneys approved what he wanted in the letter). Thus, his

As part of his defense, Juravin claimed he had help: "The medical director's job is to check the website, to check – to write the instructions, to check the formulation, to help me to choose the right raw materials, and basically anything that is medical and listen also to the customers." Trial Tr. 8/18/20 at 8:11-15. But then, Juravin contradicted that claim, saying he did not remember asking Dr. Finesmith to check the website. Trial Tr. 8/18/20 at 13:12-16. Finesmith agrees – he did not recall being asked to review the website for information that needed to be corrected. Finesmith Tr. at 206:14-207:7 (ECF No. 61-3). Then came the sweeping statement that, according to Juravin, Finesmith had "complete independence" and was tasked with "find[ing] out how we can improve." Trial Tr. 8/18/20 at 7:2-4. Yet, from Finesmith's perspective, Juravin provided a "significant amount of input and guidance" and would direct Finesmith in what Juravin wanted. Finesmith Tr. at 42:22-43:14 (ECF No. 61-3). Moreover, Finesmith believed he worked *for* Juravin, and that Juravin had the final say as to what went on the website. Finesmith Tr. at 63:17-64:3, 83:5-12 (ECF No. 61-3). Juravin even wrote at least one of the scripts for the videos Finesmith recorded, and told Dr. Finesmith to wear a lab coat for the videos. Finesmith Tr. at 118:18-119:25, 120:25-121:7, 122:5-123:9, 127:5-128:9 (ECF No. 61-3).

Later, Juravin tried to distance his websites from the fraudulent claims. He claimed at trial that he did not advertise to actually sell products, but rather, the advertisement "was just, here, we have some option here, some alternative, consider it." Trial Tr. 8/18/20 at 26:23-27:2. In addition, Juravin asserted "nobody purchases from the website. It doesn't matter what I say on the website." Trial Tr. 8/17/20 at 174:12-22. These statements are preposterous attempts to

---

claim of a low complaint rate misses the point, and exposes another falsehood in his testimony – that he did not know about customers' negative comments. Further, it is unclear how much Juravin's attempts to suppress negative comments may have neutralized any potential probative value of customer complaints. *See infra* pp. 32-33.

revise history – Juravin has acknowledged spending $12 million on advertising meant to drive customers to the Roca Labs websites.  PX 137 (2/17/17 Depo. Transcript) at 445:24-447:11; *see also* PX 118-121 (banner ads Roca Labs placed, and links identifying ad placements).  In more revisionist history, in response to questions from the Court, he posited a new theory – that the claims made on the website were just "points for discussion" for prospective customers to ask existing users when the prospective customer purportedly inquired of an existing user whether the products worked as claimed.  Trial Tr. 8/18/20 at 59:12-60:2.  It strains credulity to believe that Juravin included material claims about central characteristics of the products on the website and in all of the advertising simply to serve as discussion points for prospective customers, *and* that he spent $12 million to promote an "option" for consumers to consider.

> ii.    **Juravin's Substantiation Consisted of Nothing More Than Unrecorded Anecdotes and Conjecture, and He Knew It.**

District Court findings relevant to these claims:

- "Defendants made express claims regarding weight loss.  Those express claims, which significantly involve health, are inherently material."  *Roca Labs*, 345 F. Supp. 3d at 1386.

- "Defendants disseminated their claims online – through the Roca Labs Websites and online advertisements – to direct consumers to the Roca Labs Websites to purchase the products.  The ads intentionally contained medical images and terminology to bolster the credibility of Defendants' claims and induce customers to believe that the claims were scientifically validated by the medical community."  *Id.* at 1386-87.

- "Defendants failed to produce any competent and reliable scientific evidence to substantiate their claims."  *Id.* at 1387.

- "In September 2015, the same month that the FTC filed this Complaint, Defendants' products were studied by the Center for Applied Health Sciences, which issued a report after a clinical trial on the Roca Labs products. …The results showed that the participants did not lose weight after taking the Roca Labs products and that there was a 'slight but statistically insignificant 'trend' that active users reported feeling less hungry three hours after taking the product.'"  *Id.* at 1387-88.

- The FTC's expert "opined that the scientific articles on weight loss and individual dietary fibers, the specific articles posted on Roca Labs Websites, and other materials provided by Roca Labs do not offer any competent and reliable scientific evidence in support of Defendants' claims." *Id.* at 1388.

- "As it relates specifically to Count II, the FTC also has demonstrated that Defendants' claim that the use of Formula and Anti-Cravings is scientifically proven to have a ninety-percent success rate in forcing users to eat half their usual food intake and cause substantial weight loss is false. This representation of success is an establishment claim because the claim purports to be supported by scientific evidence. …Defendants have advertised the 'scientifically proven' claim online, but they have not produced any evidence to support the claim. As discussed above, Defendants have failed to provide any evidence of a valid clinical study on the Roca Labs products. Hence, the unsubstantiated claim is false and likely to mislead consumers into believing it was supported when it was not." *Id.*

- "The FTC has established that Juravin knew of the material misrepresentations and either participated in the deceptive acts or had authority to control them. Juravin testified that anything that was on the site was his responsibility. Juravin controlled virtually every aspect of the Corporate Defendants' business, including marketing, websites, claim substantiation, expenditures, personnel, and lawsuits. Juravin also stated that he was in charge of daily operations and was 'responsible for all matters involving Roca Labs, including advertisements.'" *Id.* at 1400.

In addition to the findings above, the FTC established that despite the fact that he had no formal training in nutrition, medicine, psychology, or psychiatry (Trial Tr. 8/17/20 at 15:16-16:16), Juravin was responsible for the product formulas sold by Roca Labs. PX 137 (2/17/17 Depo. Tr.) at 137:5-7. But, according to Juravin's trial testimony, the medical director was to check the product labels, the ingredients, and knew the quantities too. Trial Tr. 8/18/20 at 9:2-4. However, the medical director, Dr. Finesmith, did not conduct an ongoing investigation of the ingredients. Finesmith Tr. at 30:12-31:5 (ECF No. 61-3). Likewise, Dr. Finesmith stated he never knew the percentages of ingredients in the formula. Finesmith Tr. at 208:2-17 (ECF No. 61-3).

The Roca Labs products have never been the subject of a clinical trial.  Trial Tr. 8/17/20 at 46:24-47:13.  No study of the actual products exists to show efficacy for any of the claims.[8] Trial Tr. 8/17/20 at 47:19-48:10.  The first medical director for Roca Labs recommended to Juravin that the company obtain a double-blind study on the products.  Finesmith Tr. at 63:10-66:23 (ECF No. 61-3) (testifying that he had several discussions with Juravin about the need for a double-blind research study).  Juravin claimed he could not recall whether Dr. Finesmith raised that issue with him, but that Juravin "always wanted to go with the clinical part but it was impossible."  Trial Tr. 8/17/20 at 58:5-20.  Juravin described what he viewed as some hurdles to conducting a clinical trial on Roca Labs' products.  Notably, all of them lack corroboration. First, Juravin claimed a clinical trial would be expensive – "maybe three million dollars, five million dollars and so on…."  Trial Tr. 8/18/20 at 14:9-12.  Then, he speculated that the application pool for test subjects would not reflect his customer base because most would be people "normally that donate blood and – and sperm."  Trial Tr. 8/18/20 at 14:14-22.  For that reason, they would not represent his customers who purportedly often save money for six to seven months to purchase it.  Trial Tr. 8/18/20 at 14:14-22.  Juravin also assumed that because the subjects in a clinical trial would be paid to participate, "there is no way that they go home and they don't drink coffee, they don't do, you know, refrain from fried foods.  There is no way."  Trial Tr. 8/18/20 at 14:22-15:1.  Notably, none of these so-called issues relate at all to the actual products he sold via Roca Labs (*i.e.*, products that supposedly did not include dietary restrictions (PX 80, and 8, 49, 52, 99)).  And finally, he claimed he was told that his "coaching" could not be part of a clinical trial, and without that, a clinical trial is "not possible."  Trial Tr.

---

[8] In September 2015, Juravin obtained a study of the "morning dose" – one of the two products Roca Labs sold during the relevant period.  However, the District Court found that study was flawed.  *Roca Labs*, 345 F. Supp. 3d at 1387-88.  Moreover, the results of the flawed study did not support the efficacy claims.  *Id.*

8/18/20 at 15:8-13.  Juravin posited that prior to the "boot camp" he instituted after the

Enforcement Action,[9] he had a "group" that he claimed included coaching.  Trial Tr. 8/18/20 at

19:24-20:4.  He stated that Sharon King and Sharon Hensley (a/k/a Roxie) were involved with

the group from the beginning.[10]  Trial Tr. 8/18/20 at 20:3-12.  Juravin seemingly was not part of

the "group" because he did not often speak directly with customers.  Trial Tr. 8/18/20 at 37:13-

20; PX 137 (2/17/17 Depo. Tr.) at 529:19-530:1.  According to Ms. Hensley, she spent only a

small portion of her time talking to actual customers and users of Roca Labs products.

Specifically, Ms. Hensley has testified that when she was a coach, she spoke to *potential*

customers who had questions about the formula, and her experience with it.  Hensley Tr. at

51:10-16 (ECF No. 61-2).  Then, as a success coach manager, she handled scheduling for the

four or five success coaches who worked a shift a week.  Hensley Tr. at 65:8-21 (ECF No. 61-2).

Overall, she spent 90 percent of her time speaking with *potential* customers.  Hensley Tr. at

214:22-215:6, 225:25-226:23 (ECF No. 61-2).  Thus, it is far from clear what effect Ms.

Hensley's roughly four hours per week of coaching (assuming *all* the rest of her 40-hour work-

week was actually spent with users of the products) may have had on actual customers of Roca

Labs.  More importantly, it is equally unclear whether the exclusion of that small amount of

corroborated "coaching" time would have made a clinical study of the products impossible, as

Juravin claimed.

    At trial, the FTC also established that Roca Labs did not collect or retain any data about

customers' experiences with the products.  Neither Juravin nor Roca Labs tracked customer

experience in any organized format.  Trial Tr. 8/17/20 at 51:3-25.  Roca Labs did not collect

---

[9] Juravin admitted at trial that his "boot camp" did not exist until, at the earliest, sometime in 2015.  Trial Tr. 8/18/20 at 19:24-20:2.

[10] Ms. Hensley begin working for Roca labs until 2013.  Hensley Tr. at 32:17-33:3 (ECF No. 61-2).

customer information to support the claimed 90 percent success rate, nor any of the efficacy

claims.  King Tr. at 151:1-5 (ECF No. 61-1).  Although the timeframe was unclear as to when

Juravin conducted supposed the mini experiments using free products[11] that had not yet been

offered for sale, what was clear was that he did not retain any of those customers' feedback in a

database.  Trial Tr. 8/17/20 at 51:3-7, 170:15-172:11.  To the extent any "tracking" happened

during the relevant period, such information exists purely in Juravin's head.  In addition, as the

following showed during trial, the rest of the "bases" in Juravin's head for the claims is his own

psychological quackery.

Instead of numbers, documented experiences, or science, Juravin relied on anecdotes and

conjecture.  Specifically, he cited the following as support for each of the claims at issue:

**Claim:**  Use of Defendant's products, including Roca Labs Formula and Roca Labs
Anti-Cravings, enabled the user to reduce food intake by 50% and to lose
substantial amounts of weight quickly, including as much as 21 pounds in one
month, and as much as 100 pounds in seven to ten months.[12]

**Substantiation:**  Juravin concocted the reduction in stomach availability using a set
stomach volume, and a series of assumptions about how much liquid the fiber in
Roca Labs products would absorb and retain over time, to create a sensation of
"fullness."  PX 137 (2/17/17 Depo. Tr.) at 538:21-540:24.

At trial, Juravin admitted he did not have clinical or scientific evidence to support
the claim that use of the formula would reduce one's food intake by 50 percent.

---

[11] At trial, Juravin made several references to providing products for free as a way to test them
prior to offering them for sale.  *E.g.*, Trial Tr. 8/17/20 at 106:5-17, 170:15-172:11.  However, in
the Enforcement Action, Juravin denied ever providing products for free (other than to Ms.
Laporte) and he specifically denied that anyone would have received free products as a result of
their exposure to the company.  PX 137 (2/17/17 Depo. Tr.) at 565:7-566:5.  Moreover, in his
written discovery responses and during four days' of deposition testimony, Juravin never
mentioned free trials.  *See* PX 3, 134-137, 160-162 (Interrogatory 1 asked about substantiation,
and Interrogatory 9 inquired about free products for testimonials).  Juravin has demonstrated care
when defining when one is a customer.  *E.g.*, PX 136 (2/15/17 Depo. Tr.) at 390:3-11
(distinguishing between user and customer); PX 137 (2/17/17 Depo. Tr.) at 529:19-24, 563:22-
564:16 (same).  The new testimony about human experiments raises a number of concerns, not
least of which is Juravin's truthfulness.

[12] PX 7, 9, 20, 45, 53, 60-61, 67, 84, 88, 94-95; Video Exhibits PX 75, 77.

Trial Tr. 8/17/20 at 49:15-50:6. During direct by his own counsel, Juravin reiterated that he relied on customer feedback, obtained through Ms. King and Ms. Hensley, to support the claim that the Roca Labs products would reduce one's food intake by 50 percent. Trial Tr. 8/18/20 at 34:5-35:14. Juravin further explained that the use of that claim at the beginning was meant to set expectations for the customers, and "[n]obody wrote back and said, hey, I didn't eat 50 percent less. So…." Trial Tr. 8/18/20 at 34:24-35:14.

**Claim:** 90% of users of Defendant's products, including Roca Labs Formula and Roca Labs Anti-Cravings, would lose substantial amounts of weight.[13]

**Substantiation:** The 90 percent figure comes from third-hand information customers supposedly discussed with Ms. King and Ms. Hensley (although nobody documented that information) who then allegedly passed the information along to Juravin. PX 137 (2/17/17 Depo. Tr.) at 529:9-530:10, 531:6-16. Juravin confirmed that at trial. Trial Tr. 8/18/20 at 36:6-37:20; Trial Tr. 8/17/20 at 60:12-63:10. Notably, Sharon Hensley only began working as a success coach and success coach manager in 2013 – several years after Juravin began to market and sell the Roca Labs products. Hensley Tr. at 32:17-33:3 (ECF No. 61-2).

Nevertheless, Juravin claimed he had "scientific answers" to support the 90 percent success rate. Trial Tr. 8/17/20 at 50:8-15. But then admitted he did not track customers' claimed weight loss "in an organized manner." Trial Tr. 8/17/20 at 51:3-25. When he attempted to reference a Facebook page and Facebook group containing that information, he could not identify the specific page, but said the tracking may have been "something I did for one or two days." Trial Tr. 8/17/20 at 52:1-53:17. Nothing in the product instructions included a requirement that users report their weight to Roca Labs on a regular basis (or at all). Trial Tr. 8/17/20 at 53:18-54:3.

In addition, Juravin stated that if done widely and over a very long time, a "scientific answer" could come from merely observing posts made by supposed users of Roca Labs products on social medial platforms. Trial Tr. 8/17/20 at 65:1-8. But he believes that his general impression of customers' success obtained from discussions with people who worked for Roca Labs about their conversions with customers was "a lot better" evidence to support the success claim. Trial Tr. 8/17/20 at 65:1-14. In fact, Juravin claims "[t]here's no other way of doing it." Trial Tr. 8/17/20 at 66:7-11.

Finally, Juravin claims it was Dr. Finesmith's job to review claims on the website like the success rate, and "always to question what I do." Trial Tr. 8/18/20 at 37:22-25. But Dr. Finesmith did not remember being asked to review the website

---

[13] PX 15, 21, 54, 56, 64, 86, 106, 110; Video Exhibits PX 75, 76, 155 (FTC-PROD-004575).

for information that needed to be corrected.  Finesmith Tr. at 206:14-207:7 (ECF
No. 61-3).

**Claim:**  Defendant's products, including Roca Labs Formula and Roca Labs Anti-
Cravings, were comparable or superior to bariatric surgery in providing weight-
loss benefits.[14]

**Substantiation:**  Juravin admitted he made claims that Roca Labs products were
comparable or superior to bariatric surgery.  Trial Tr. 8/17/20 at 74:19-22.  For
substantiation, Juravin conjured a series of statistics from internet searches to
"establish" Roca Labs products were safer and cheaper than bariatric surgery.  PX
137 (2/17/17 Depo. Tr.) at 552:14-553:11.  At trial, Juravin vaguely referred to a
study and seemed to try to link that to some kind of informal information
collected from customers who indicated in their applications that they had
bariatric surgery.  Trial Tr. 8/17/20 at 76:14-77:21.  In support of this theory, he
claimed "we talked to them more often than we talked to other customers because
we were interested to know about the comparison."  Trial Tr. 8/17/20 at 77:2-9.
Yet, he went on to admit he did not know how many customers had the surgery,
and that the customer list Roca Labs maintained did not include information about
any customer's weight after using the products.  Trial Tr. 8/17/20 at 78:1-79:11.

By superior he means the surgery will not help with cravings.  Juravin claimed the
"main, main big thing, cravings" is the difference between his products and
surgery.  He claimed cravings are a "sickness" and that the anti-cravings product
balances sugar levels to help overcome them.  PX 137 (2/17/17 Depo. Tr.) at
550:17-551:8.  When asked about his prior testimony that the products were better
than surgery because the products allowed one to control cravings, he only stated
"that was my opinion at the time… but it's not the only thing …."  Trial Tr.
8/17/20 at 76:1-12.

**Claim:**  Defendant's products, including Roca Labs Formula and Roca Labs Anti-
Cravings, were safe and effective for weight loss in children as young as six years
old.[15]

**Substantiation:**  He had none.  Regarding the claim that Roca Labs products were
safe for children to take, Juravin first claimed he could not remember those claims
even when presented with a copy of them from the Roca Labs website.  Trial Tr.
8/17/20 at 67:1-23.  Then, he posited it was "taken away pretty fast."  Trial Tr.
8/17/20 at 67:18-23.  However, the copies of the website in evidence show
otherwise.  *Compare* PX 10, 90, 91 (captured May 6, 2015), *with* PX 70 (archive
of page as it appeared in March 2013, captured Dec. 2, 2014); *see also* PX 135
(2/15/17 Depo. Tr.) at 127:22-128:8.  Then later, after being reminded of his prior

---

[14] PX 6-8, 53, 60-61, 67, 84, 88, 95; Video Exhibits PX 75, 78, 79.

[15] PX 10, 70, 90; Video Exhibit PX 155 (FTC-PROD-004543).

testimony on the issue, he conceded he approved the claims.  Trial Tr. 8/17/20 at 70:22-72:4.

Juravin also admitted he wrote the script for the video about children's use of the Roca Labs products – further stating he was "proud of that."  PX 155 (video FTC-PROD-004543); Trial Tr. 8/17/20 at 73:1-17.  When asked about the support for those claims, Juravin cited research on the ingredients in the products (but not the products themselves) and discussions he had with some unidentified "experts."  Trial Tr. 8/17/20 at 73:18-74:3.  Like other customers, he did not formally track any weight loss experienced by child users.  Trial Tr. 8/17/20 at 74:4-18.

Juravin's own prior testimony about what he knew lay behind his claims, and the extent of his deception is chilling.  When asked for the basis for the claim that the Roca Labs products left only twenty percent of one's stomach available for ten to sixteen hours, Juravin stated as follows:

I need a psychological effect.  And I will explain to you where I trick the customer's psyche.  There is a scientific proof.  Absolutely no question about it.  **It's called fasting 16 hours.**  If you fast for 16 hours, you will definitely, definitely lose weight.  Because the body gets into a mechanism of fasting 16 hours.  …I need to make my fat customer, I need to make them fast 16 hours.  I cannot be direct with them, and say, hey, you're going to fast 16 hours.  Just listening to that is scary.  I have to trick the customer with love.

…So the way it works is like this.  I tell them when you wake up in the morning, you will consume the gastric bypass effect.  Okay.  No big deal.  They consume it.  I know from scientific reasons, I know from the research, I just know that it will remain in the stomach a long time.  **Not 16 hours, not 10 hours.  It will remain three and a half hours, maybe four.**  That's all I need to keep them to eat after four hours according to the instructions.  That's all I want the formula to do.  But I want to stick in their mind, you have no room in your stomach.  **It's part of the psychology.  You took a gastric bypass effect.  You feel like this.  There is no room.  But between you and I, it leaves the digestive system after three and a half hours.**

Next, I tell them, your last calorie intake, not food.  …Your last calorie intake is four hours before you go to sleep.  And then I continue to give them remedies, like the pills, anti-cravings and other things.  And if I can continue like this all day giving them the pill that can sustain them a few hours and give them again the gastric bypass effect all the way four hours before they fall asleep, guess what I did?  **I got my 16 hours fasting.  But I can never tell them that.  I can never reveal to them or to anybody else that this is what I do with them.**

So when I tell them the 20 percent is a given, because you just fill up the stomach with the morning dose.  **But the 10 to 16 hour, no.  I know that it's only four**

> **hours.  But I can tell them 10 to 16 hours** because of the psychological effect.
> All of that is a psychological effect.

PX 137 (2/17/17 Depo. Tr.) at 542:24-544:25 (emphasis added).  Juravin even claimed he was

proud of his methods in providing remedies like pills and anti-cravings to continue to sustain

customers (what he called giving them the gastric bypass effect) to get to the real goal of 16

hours of fasting each day – a goal he could never reveal to customers.  Trial Tr. 8/17/20 at 89:6-

18.  He claimed that his customers could not do this on their own, "otherwise they would have

done it."  Trial Tr. 8/17/20 at 89:19-90:6.  Specifically, he testified that the "regimen helps them

to fast 16 hours, and I take them from one product to another, to another, ***and somehow*** it's a

great, great, great, success…." Trial Tr. 8/17/20 at 89:19-90:6 (emphasis added).

The 16-hour fasting period that was one of the goals of the "regimen" relies in part on the

Roca Labs products ability to occupy one's stomach for 10 to 16 hours.  In response to queries

about the claim that one's stomach would remain occupied for 10 to 16 hours, Juravin testified

that "[t]here's a lot of psychology in weight loss and it's a combination of things."  Trial Tr.

8/17/20 at 87:10-18."  At trial, two of the things Juravin claimed that his customers needed in

order to be successful were:  (1) his coaching (the less sophisticated name for psychology (Trial

Tr. 8/17/20 at 99:4-7)), and (2) the "regimen."  Trial Tr. 8/17/20 at 89:19-90:6.  According to

Juravin's trial testimony, the "regimen" includes the litany of rules that supposedly accompany

the Roca Labs products.  *Id*.  However, Juravin's expounded upon rules are incongruous with the

many repeated product representations he approved.  Both on the website and in video, he

represented that use of the Roca Labs products did not include dietary restrictions.  PX 80, 155

(FTC-PROD-004542), and 8, 49, 52, 99); Trial Tr. 8/17/20 at 79:12-19.  When confronted with

one section of the website that contained the claims "no menus, no diet restrictions" he claimed

"[i]t was misworded.  Of course we have diet restrictions."  Trial Tr. 8/17/20 at 79:20-15.  He

claimed he could not recall a video claiming "no rules because we do have rules."  Trial Tr.

8/17/20 at 80:21-24.  During trial, the Court viewed the video about the "no menus, no diet

restrictions" claims, which included claims that "you can continue to eat the foods you like – no

special restrictions are necessary" because you will not have room due to the formula expanding

to fill your stomach, leaving only 20 percent of the space available for food intake.  PX 155

(FTC-PROD-004542).  The claims in the video also included that you do not need to count every

calorie, or avoid the foods you like, but since you will be eating less, it is *recommended* that you

eat nutritious, low calorie foods supplemented with vitamins.  PX 155 (FTC-PROD-004542).  In

response to this video, whose script Juravin wrote (Trial Tr. 8/17/20 at 45:2-11; PX 136 (2/16/17

Depo. Tr.) at 384:10-14), Juravin only stated "I understand the confusion now."  Trial Tr.

8/17/20 at 80:25-81:5.  Juravin readily acknowledged that his products came with numerous

restrictions.  Trial Tr. 8/17/20 at 80:21-24, 81:7-82:16, 86:5-23, 179:13-25; *see also* PX 42.  He

also acknowledged a slew of other rules and restrictions that he had outlined in his prior

testimony.  Trial Tr. 8/17/20 at 82:17-86:4 (referring to PX 137 (2/17/17 Depo. Tr.) starting at

555).[16]  But the "regimen" and its rules were not things consumers knew they were buying.  *E.g.*,

PX 17, 97, 103, 133.  Quite the opposite – Juravin featured the "no rules, no diet restrictions"

claims prominently on the Roca Labs websites and lab coat videos.  *E.g.*, PX 8, 49, 52, 80, 99,

155 (FTC-PROD-004542) (all claiming no menus, no diet restrictions); PX 7, 53, 67, 84, 95 (all

referring to rules as merely "recommended rules for suggested use).

---

[16] According to his prior description of the rules, customers were told to:  (i) not drink coffee, soda or bubbly beverages; (ii) not eat dairy or cheeses; (iii) avoid fried or greasy foods and limit pasta and bread (to 10 slices or less per week); (iv) exercise consistently; (v) not eat more than 1,200 calories per day; (vi) only eat four hours after waking; (vii) eat measured portions, chew each bite for 20 seconds, then wait another 30 seconds before taking the next bite; (viii) eat the last meal of the day four hours before falling asleep, which he called a "clear rule;" and (ix) limit one's eating interval to a 9-hour period in the day.  Trial Tr. 8/17/20 at 82:17-86:23.

Notably, Juravin admitted that if consumers did a series of things he required as part of the "rules" (such a limiting calories, avoiding certain foods, eating during a limited window each day, drinking a certain volume of water, and incorporating regular exercise), consumers would lose weight even without Roca Labs products.  Specifically, Juravin testified that:

> If they do the three liters on their own, they would lose. If they do exercise, they would lose. If they do the 16 hours on their own, they would lose. If they do this -- I put everything all together, including scaring them, that if they don't succeed now, they will go to a surgery.
>
> … I'm willing -- if I'm right now 110 pounds [overweight], trick me, do with me whatever you want, just get me to be a healthy weight. I don't care what you do to me. This is the situation of these people.

PX 137 (2/17/17 Depo. Tr.) at 545:22-546:14.

Juravin's basis for his claim is apparently his own psychology training.  He admitted that he often refers to psychology when he has testified about Roca Labs products.  Trial Tr. 8/17/20 at 96:21-23.  He claims psychology is important to the coaching aspect.[17]  Trial Tr. 8/17/20 at 98:19-24.  Part of the psychology for the products also includes the image of the partially full stomach that he includes among the claims shown to prospective customers.  Trial Tr. 8/17/20 at 98:25-99:3.  Although he repeatedly refers to psychology, Juravin tried to downplay that aspect by stating it's merely a fancy way of referring to coaching.  Trial Tr. 8/17/20 at 99:4-7.  He also conceded he has only taken a few courses in psychology in college, and that the medical director at Roca Labs during the relevant period was not a licensed psychologist or psychiatrist.  Trial Tr. 8/17/20 at 99:8-24.

In his defense, Juravin claims he "went above and beyond" because he did not need to have a medical director, or any substantiation because his product was a supplement, not a drug.

---

[17] Yet, Juravin claimed on the Roca Labs website that "psychological issues must be dealt with separately."  PX 21, 41, 45, 56.

Trial Tr. 8/17/20 at 160:14-161:2, 161:3-13.  Yet, the medical director he hired had no relevant experience beyond his medical degree.  That medical director, Dr. Finesmith, specialized in pediatric neurology; had nothing to do with product formulation; never knew what proportions of ingredients were in Roca Labs' products; never monitored the claims made on the websites; and resigned in 2013.  Finesmith Tr. at 15:2-11, 27:22-24, 208:5-17, 31:6-8, 21:12-18 (ECF No. 61-3).  Thus, from Dr. Finesmith's resignation through the end of 2015, Roca Labs had no medical director.  Trial Tr. 8/17/20 at 59:3-14.

Finally, Juravin has claimed he made a huge mistake when testifying in the FTC's Enforcement Action without a translator.  Trial Tr. 8/17/20 at 13:13-20.  However, when discussing that "mistake" at trial – specifically, his use of the word "trick" as in "trick the customer" – he stated "[t]hat's the best word that I could, even two years later I cannot come up with a better word."  Trial Tr. 8/17/20 at 91:20-24.  He claimed he used "the word 'trick' as in a good, good, good connotation."  Trial Tr. 8/17/20 at 92:1-6.  He went on to reiterate:  "I do have an explanation and I still don't have a better word even two years later.  It's the best word."  Trial Tr. 8/17/20 at 92:20-24.  Yet, despite three times saying "trick" was used correctly, Juravin again changed his mind, claiming he meant a technique, shortcut, or a smart way to achieve something.  Trial Tr. 8/17/20 at 93:10-25.  Then, he quibbled with his own previously-sworn clarification (PX 163), claiming his attorneys wrote it and that he "probably didn't all the way read it" when he stated he meant maybe psychological advice when he wrote psychological device.  Trial Tr. 8/17/20 at 94:1-96:19.  And he again attempted to clarify, returning once more to the word "trick":

> It's like a psychological element, device, but it's definitely a psychological, you know.  Yes, it is a psychological advice, device, element.  It's many words to the word 'trick.'  The idea is to help people –.

Trial Tr. 8/17/20 at 96:14-19.  Throughout that exploration of the various possible meanings for

his initial word choice of "trick" and later clarification of "psychological device," Juravin did not

seek out another word or phrase from the interpreter to better represent the concept he was trying

to express.  Trial Tr. 8/17/20 at 92:20-96:19.

> ### iii.    Juravin Knew Testimonials Posted on Roca Labs' Websites Included Videos From Paid Actors and A "Success Coach."

District Court findings relevant to these claims:

- "The Roca Labs Websites included testimonials and third-party reviews as promotional material.  Defendants solicited the testimonials, called 'Success Videos,' by offering to pay customers who purchased the Roca Labs products up to $1,000.00 upon meeting certain conditions, such as achieving a certain interim weigh loss goal, providing an inspirational and convincing success story, and demonstrating that the weight loss is evident in 'before & after' images.  Defendants did not disclose that the people in the videos were paid or received offers of pay for their testimonials.  Defendants also did not disclose that they, or someone working on their behalf, posted testimonials or other information about Roca Labs products on third-party blogs or websites." *Roca Labs*, 345 F. Supp. 3d at 1382.

- "Purportedly satisfied customers – 'Carla' and 'Roxie' – depicted in the videos posted on RocaLabs.com were actually Defendants' employees." *Id.* at 1389.

- "Roca Labs General Manager Sharon King ('King') testified that she wrote a Roca Labs product review under the name of 'Fran,' which was a fictitious name, and that Juravin edited the review." *Id.*

- "Juravin also directed King to instruct 'the Customer Service people' to write posts or reviews and comment on Roca Labs Facebook advertisements.  Defendants did not instruct the employees to disclose their affiliation with Defendants." *Id.*

- "Roca Labs employee Sharon Hensley ('Hensley'), who appeared on video as 'Roxie,' testified that she was asked to post positive comments monthly on Facebook about Roca Labs monthly and did not state her association with Defendants." *Id.*

- Defendants "argue that Roxie's testimonial is valid because the weight loss occurred prior to her employment, although Roxie's video was recorded after she was employed by Defendants.  Defendants' argument misses the point.  The fact that Roxie experienced weight loss success prior to her employment

has no bearing on the fact that Defendants failed to disclose their financial relationship with Roxie and others who gave testimonials. As such, the FTC has established that Defendants failed to disclose that they owned the website, provided review of their own products, or had a financial relationship with those who provided testimonials." *Id.* at 1389-90.

- "The financial relationship with the testimonialists and ownership of Gastricbypass.me is material. Defendants exclusively marketed their products online and used testimonials and the website to entice prospective buyers to purchase the Roca Labs products. The financial relationship also is material because Gastricbypass.me website and testimonials involve health matters, weight loss claims, and other information important to the consumer in deciding whether to purchase the Roca Labs products." *Id.* at 1390.

Juravin admits he created the "inspirational" videos, or what Roca Labs calls testimonials (PX 14 & 89), involving paid actors towards the end of 2010. Trial Tr. 8/18/20 at 22:1-8. Juravin used a number of descriptions for these videos: they were experimental, inspirational, and used to jumpstart. Trial Tr. 8/17/20 at 105:18-107:8. He claimed they were used at "the very beginning" when "I let people have the product for free or at very, very, very reduced price and if somebody says, I don't like it, didn't work for me, we give them back, you know, either the money back…." Trial Tr. 8/17/20 at 106:5-17.

At trial, portions of four of the videos were played. PX 81, 155 (FTC-PROD-004584, -004611, -004603). In every video, the person featured describes her story and experience with Roca Labs' products. PX 81, 155 (FTC-PROD-004584, -004611, -004603). For each, Juravin acknowledged that the person in the video was an actor, was not a customer of Roca Labs, and that the videos did not make those facts known to a viewer. Trial Tr. 8/17/20 at 105:22-110:14.

In various places on Roca Labs websites, viewers of the page were directed to the Roca Labs' YouTube page to see videos of customers who had reached their weight loss goals. PX 6, 7, 14, 20, 60; Trial Tr. 8/17/20 at 110:15-114:5. According to Ms. King, Juravin controlled the Roca Labs YouTube site, including determining what would be posted to it. King Tr. at 186:21-187:15 (ECF No. 61-1). Despite Juravin's claims that the actors' videos appeared only in the

23

beginning, the evidence in the record clearly shows those four videos featuring actors still appeared among the Roca Labs testimonials into 2015. PX 14, 26, 89; Trial Tr. 8/17/20 at 115:8-116:19. When pressed on that timing, Juravin claimed the actors' videos were "pushed down." Trial Tr. 8/17/20 at 114:6-15. Once again, the evidence shows many actors' videos appeared well above the bottom row of video thumbnails on the "reviews" pages. PX 14, 26, 89. One actor's video even was featured as a "success story" on other pages in the Roca Labs websites. PX 112 (FTC-PROD-109708), 116 (mini-gastric-bypass.me); Trial Tr. 8/17/20 at 117:16-118:6.

At trial, the Court viewed a segment from the video testimonial recorded by Ms. Hensley. PX 83. Juravin insisted that Ms. Hensley (Roxie) was not working as a success coach at the time she recorded her testimonial video. Trial Tr. 8/17/20 at 99:25-101:25. The District Court, however, found otherwise based on Ms. Hensley's testimony. *Roca Labs*, 345 F. Supp. 3d at 1389 ("Purportedly satisfied customers – 'Carla' and 'Roxie' – depicted in the videos posted on RocaLabs.com were actually Defendants' employees."). Juravin's attempts during trial to justify the lack of disclosure about Ms. Hensley's financial relationship to Roca Labs by distinguishing between images presented in the video and Ms. Hensley's status as a success coach (claiming the images in the video represent earlier times when she was not a coach) are a desperate attempt to create a distinction that has no relevance. Trial Tr. 8/17/20 at 102:1-104:9. Juravin's parsing does not change the fact that when Ms. Hensley recorded the video, she was being paid by Roca Labs, and that was not disclosed in the video or on the Roca Labs webpages where her video appeared. PX 83, 6, 92.

Although Juravin claimed that customers would know the difference between the videos featuring paid actors and those of purported real customers, he could not explain how that was

so, other than noting that the paid actor videos featured a white background, not someone with a background reflecting his or her home.  Trial Tr. 8/18/20 at 23: 19-24:6.  He claimed that "customers will ignore them," referring to the professional videos.  Trial Tr. 8/18/20 at 24:9-15.  Yet again, he did not explain how he supposedly knew that any prospective customers would have done exactly that.  As he has admitted, he did not speak directly to customers.  Trial Tr. 8/18/20 at 37:13-20.  Eventually, Juravin admitted that potential customers would "just use it for inspiration" because the actor videos were "just inspirational."  Trial Tr. 8/17/20 at 117:2-8.

In addition to recording testimonials, Juravin also asked Roca Labs coaches to post positive reviews online, including on third party websites.  Juravin encouraged Ms. Hensley to post reviews on pissedconsumer.com, on Roca Labs' Facebook page, and on the Better Business Bureau's site because "there was so much negativity."  Hensley Tr. at 93:10-94:3, 136:2-137:8, 138:13-140:7 (ECF No. 61-2); PX 145.  Sometimes, as in the case of reviews on the Better Business Bureau's site, Juravin asked Ms. King to instruct those who worked for Roca Labs to write reviews.  PX 136 (2/16/17 Depo. Tr.) at 245:12-246:12; PX 132.  According to Juravin, the Better Business Bureau was "not reflecting the truth about the company."  *Id.*  In fact, Juravin was so concerned about negative comments about Roca Labs that he paid a third party $40,000 to hide negative comments from Google search results.  PX 135 (2/15/17 Depo. Tr.) at 55:3-62:7; PX 137 (2/17/17 Depo. Tr.) at 488:1-494:9.  Juravin claimed that negative reviews hurt Roca Labs more than the $40,000 he paid to suppress and demote those comments.  PX 135 (2/15/17 Depo. Tr.) at 61:25-62:7.  His acts to suppress consumers' actual testimonials speaks volumes about his intent.

### iv.   Juravin Purposefully Did Not Disclose Gastricbypass.me Was Owned By Roca Labs.

District Court findings relevant to these claims:

- "Defendants failed to disclose that they operated Gastricbypass.me, a website that discusses bariatric surgery and features a 'Surgical Alternatives' page devoted to positive commentary on Roca Labs products and which also sells Roca Labs products." *Roca Labs*, 345 F. Supp. 3d at 1382.

- "Juravin testified that he created Gastricbypass.me to 'educate and scare people about' gastric bypass surgery." *Id.* at 1389.

- Only Roca Labs products were discussed favorably on the site, although there was no disclosure of the affiliation with Defendants. Juravin stated that Gastricbypass.me was controlled by Roca Labs and that he was responsible for the content, but he did not see any value in letting consumers know '[h]ey we are Roca Labs.'" *Id.*

- "[T]he FTC has established that Defendants failed to disclose that they owned the website, provided review of their own products, or had a financial relationship with those who provided testimonials." *Id.* at 1389-90.

- "The financial relationship with the testimonialists and ownership of Gastricbypass.me is material. Defendants exclusively marketed their products online and used testimonials and the website to entice prospective buyers to purchase the Roca Labs products. The financial relationship also is material because Gastricbypass.me website and testimonials involve health matters, weight loss claims, and other information important to the consumer in deciding whether to purchase Roca Labs products." *Id.* at 1390.

Juravin admitted that he approved the claims on the website gastricbypass.me. Trial Tr. 8/17/20 at 118:22-119:6; *see also* PX 24, 25, 109, 111. He also conceded that the only product mentioned under the "surgical alternatives" section of the site was Roca Labs'. Trial Tr. 8/17/20 at 119:15-21. Juravin also agreed that the gastricbypass.me site did not state it was affiliated with Roca Labs. Trial Tr. 8/17/20 at 121:3-122:12. He even conceded he "didn't see any value" in disclosing Roca Labs' affiliation, claiming "I don't think there is any value in saying, 'Hey, we are Roca Labs.'" PX 135 (2/15/17 Depo. Tr.) at 175:18-24. These facts establish that Juravin purposely kept the relationship between Roca Labs and gastricbypass.me a secret. They also prove that Juravin designed a site that claimed to be an independent source of information, but was just another advertisement for Roca Labs.

> ## v.    Consumers Were Not Required to Read The Terms and Conditions Pages on Roca Labs' Websites Prior to Purchase

District Court findings relevant to these claims:

- "Defendants' post-packaging materials misrepresented that consumers had agreed to pay hundreds of dollars more for the Roca Labs products than what they actually paid if they posted negative reviews about the products or Defendants.  Defendants do not dispute that they made the discount claim or that it is material.  Instead, Defendants argue that the discount claim is not deceptive because customers agreed to the discount and its associated requirements."  *Roca Labs*, 345 F. Supp. 3d at 1391.

- "When customers received the package of Roca Labs products, two documents were included in the package.  In the 'Summary' of the Terms and Conditions and a 'Thanks for purchasing' packaging insert, customers were told they were given a 'discount off the unsubsidized price of $1580 in exchange for [their] agreement to promote [Defendants'] products' and would owe the full price of $1,580 if they did not honor the agreement."  *Id.*

- "Defendants argue that the discount claim is not deceptive because customers were aware of and agreed to the discount and the non-disparagement clause prior to purchase.  They contend that customers were provided sufficient notice in the Terms and Conditions prior to purchase and after the purchase in the documents shipped with the products.  Defendants suggest that the prior notice in the Terms and Conditions dispels the deception.  These arguments fail for two reasons."  *Id.*

- "First, Defendants created an overall net impression that the price of the product was $480 without reference to a discount or any concessions as to publishing negative comments.  Defendants advertised that the basic package of Roca Labs products costs $480 for purchasers with a 'valid health insurance.'  In multiple online advertisements, including those that appeared on Google, Bing, and Facebook, Defendants advertised the cost as simply $480, at least for a basic package of Roca Labs products.  At the top of the 'Roca Labs Procedure Cost' page of Defendants' Websites, Defendants state 'Only $480 and NO surgery to gastric bypass cost of $8,000 + health insurance payments.  Save yourself from surgery that can cost your life.  Save 90%.'  Farther down that page, in smaller print, Defendants state that the 'Roca Labs Formula is available for as low as $480' and a display chart showing the various packages, from the basic package for $480 to the customized package for $1,080.  The price differences in the packages reflect the quantity of products ordered and the level of customer service provided. … The advertisements did not contain any disclaimers that the price was discounted or subsidized in exchange for a customer's agreement to refrain from publishing negative comments.  As such, Defendants created an overall

net impression that the price was $480, with no exceptions or limitations." *Id.* at 1391-92.

- "Second, the disclaimer in the Terms and Conditions did not dispel the net impression.  Although the Terms and Conditions were disclosed on a hyperlinked page, it was unlikely that consumers would have noticed or clicked on the link.  The link to the Terms and Conditions was at the bottom of the Rocalabs.com page, just above the 'Submit' button." *Id.* at 1392.

- "Prior to purchasing the Roca Labs products, customers were required to check a box next to the statement 'I have checked and do not have any medical reason that can prevent me from suing (*sic.*) the Roca Labs Gastric Bypass Alternative procedures and I have read and agree to the terms, privacy and money back reward/return policy.'  However, customers were not required to read the Terms and Conditions prior to purchasing.  For customers who may have accessed the Terms and Conditions, the disclaimer about the discounted price and non-disparagement clause was inconspicuous and buried among legal, contractual language.

  Hence, the disclaimer in the Terms and Conditions fails to dispel the net impression that the price was $480 with no strings attached.  …Defendants cannot avoid liability by exclusively advertising that the product costs $480 without any caveats and then burying the conditions of the discount in a separate disclaimer." *Id.*

- "**Defendants misrepresentation is material and deceptive because it is an express claim that involves important information to customers:  the price of the product and limitations on what customers could say about the products or Defendants.  A customer would likely be misled to believe that he or she had the option to purchase the product at 'full' price and maintain the ability to post negative but truthful comments.  Customers also would likely to be misled to believe that they had actually agreed to refrain from posting negative comments, when they had not agreed to do so, by paying the purportedly discounted price.**" *Id.* at 1392-93 (emphasis added).

- "The FTC alleges that restricting the flow of information to consumers and the marketplace causes or is likely to cause substantial injury.  To support its claim, the FTC cites to the declaration and expert report of Dr. Paul Pavlou ("Dr. Pavlou"), who is an associate dean and professor of information technology and strategy at Temple University.  Dr. Pavlou stated that suppressing truthful negative reviews negatively affects consumers and the marketplace.  He opined that the absence of such reviews inflates the perception of Defendants and the products and also prevents future customers from learning about potential problems.  Consequently, Dr. Pavlou stated, prospective customers are encouraged to buy products that ultimately may not be desirous or appropriate.  Without any, or even with very few, negative

reviews, it is likely that '[c]onsumers are more inclined to purchase Roca Labs' products due to their inflated perceptions of product quality, misled by the manipulated absence of negative reviews that artificially inflate[s] their expectations of product quality,' according to Dr. Pavlou.  The FTC asserts that Juravin's testimony supports its claim.  Juravin testified that he paid a company $40,000 to 'make the false comments not show up up front' because false comments 'create the wrong impression' and hurt Defendants' sales by at least $40,000."  *Id.* at 1393-94.

- "Defendants threatened legal action against customers who complained or said they would complain to the Better Business Bureau or who said they had plans to post negative comments online.  For example, customer Marie McGaha ('McGaha') stated in a declaration that she saw no negative online reviews prior to buying Roca Labs products.  'Compared to gastric bypass surgery, [i]t seemed like a good option.'  She bought the products; however, she asked for a refund because she did not like the texture of the mixture and it made her sick.  Defendants declined to give her a refund. McGaha wrote a blog about her experience, and readers called the company to complain.  Then, she received a letter from Defendants' counsel, who wrote:

    > Your statements are defamatory, you are committing tortious interference with business and inducing harassment, you have breached your contract with Roca Labs, and you are violating the Federal Lanham Act.  Additionally, your actions amount to criminal extortion, which is defined as follows: 'The obtaining of property or money from another induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.'  This is exactly what you are doing.  If this posting is not IMMEDIATELY removed, Roca Labs will have no choice but to file suit against you.  **Roca Labs will also have no choice but to contact law enforcement regarding the harassing phone calls and the extortion.**

McGaha also received an email from Defendants asking for her 'SS or driving license' so that Defendants could file a police report regarding her 'Slander, Defamation and Extortion.'  After the email and the letter, McGaha's blog was removed by WordPress, which was also threatened by Defendants with a lawsuit about the blog posts, according to McGaha.  Subsequently, McGaha stopped writing about the product and abated her pursuit of a Better Business Bureau complaint because she 'couldn't afford to get sued.'  McGaha stated she never received a refund.  Another customer, Amina Di'Leonardi ('Di'Leonardi'), stated in a declaration that she was threatened with legal action after filing a complaint with the Better Business Bureau following an unsuccessful pursuit of a $173 refund for her first installment payment on the nearly $500 purchase.  After being contacted by Defendants' attorney, Di'Leonardi withdrew her complaint because she did not want to be sued. Joyce Agbetunsin ('Agbetunsin'), a customer, stated that she was threatened with a lawsuit after telling a Roca Labs customer service representative that

29

she did not think the product was legitimate and that she wanted a refund.
Agbetunsin filed a complaint with the Better Business Bureau in June 2011,
but '[w]hen they became aggressive and threatening, I gave up.  I already lost
too much time and money dealing with the issue.'  Agbetunsin never received
her $440 refund."  *Id.* at 1394-95 (emphasis in original).

- "Because Defendants admittedly suppressed negative information about the
  products and because Dr. Pavlou testified that the absence of negative
  information could make a consumer more inclined to purchase Roca Labs
  products, the Court finds that Defendants' practices have caused or were
  likely to cause substantial injury to consumers.  The record demonstrates that
  some consumers paid hundreds of dollars for the Roca Labs products and
  unsuccessfully sought refunds because of Defendants' practice of issuing
  threats under the guise of enforcing the gag clause."  *Id.* at 1395.

From the beginning, Roca Labs had terms and conditions that purported to restrict a

customer's ability to comment negatively about the products.  PX 124 (FTC-SKING-00419-20,

00422-23).  If a customer breached that term, Roca Labs reserved the right to charge the

customer for the "full price" of the product plus additional expenses.  *Id.*  The price for the

"Formula & The Support is set at $1580."  *E.g., id.* (FTC-SKING-00419).  Roca Labs modified

the Terms & Conditions throughout the relevant period, but some form of a gag clause against

negative comments remained in each version.  PX 59 at PB5775179-FD008702 ("You agree

that, regardless of your outcome, you WILL NOT speak, publish, print, blog or write negatively

about The Product or The Company in any forum."); PX 125 at FTC-SKING-000011-12 ("If you

purchased the Formula at a conditional discounted rate, you agree that you WILL NOT speak or

publish, in any forum, criticism of the Product or the Company, and that any published

statements will be immediately removed upon the Company's Request."); PX 126 at 5 ("You

agree that regardless of your outcome, you WILL NOT speak, publish, print, blog or write

negatively about The Product or The Company in any way."); PX 127 at 10 ("You agree that

regardless of your outcome, you will **not** disparage RLN and/or any of our employees, products

or services."); PX 101 at 9 ("You agree that regardless of your personal experience with RL, you

will **not** disparage RL and/or any of its employees, products, or services.  This means that you

will not speak, publish, cause to be published, print, review, blog, or or [sic.] otherwise write

negatively about RL, or its products or its employees in any way.").  Although virtually all of the

Terms and Conditions stated customers could purchase "The Formula and The Support at full

price and without condition…" it is unclear how a customer could do so, or that she had any

indication that option was available to her.  PX 59 at PB5775179-FD008702; PX 125 at FTC-

SKING-000011; PX 126 at 5; PX 127 at 9; PX 101 at 8.

   At trial, Juravin confirmed that customers placed orders for Roca Labs products through

its website.  Trial Tr. 8/17/20 at 123:18-124:9.  The various pages involved in the order process

are contained in PX 133.  Trial Tr. 8/17/20 at 124:10-127:2.  Juravin claimed he could not

determine from the contents of that exhibit what the "full price" for the Roca Labs products was

at the time the images in PX 133 were captured.  Trial Tr. 8/17/20 at 127:3-128:24.  He claimed

the order process was dynamic and certain responses would lead to different prices.  Trial Tr.

8/17/20 at 127:14-25; 130:9-132:3.  However, captures of the "Roca Labs Procedure Cost" pages

from its website, which did not require input that would make them dynamic, do not show any

products offered for a "full price," nor are any priced at $1,580.  PX 17 (showing prices for each

product and noting health insurance discounts were *guaranteed*), 103 (same), 97.

   Prior to placing their orders, consumers were required to check a box that stated:  "I have

checked and do not have any medical reason that can prevent me from using the Roca Labs

Gastric Bypass Alternative procedure and I have read and agree to the terms, privacy and money

back reward/return policy."  PX 133 at 12; Trial Tr. 8/17/20 at 132:4-24; 136:2-11.  Customers

were not, however, compelled to review the "terms," through something like a pop-up window,

prior to placing a check in that box.  Trial Tr. 8/17/20 at 136:19-127:3; King Tr. at 94:8-95:13

(ECF No. 61-1).  After a lot of flip-flopping and quibbling over his own word choice, Juravin finally admitted to what he testified to in 2017:  consumers were not forced to view the terms prior to completing their purchases.  Trial Tr. 8/17/20 at 135:5-20, 133:3-136:17.  Again, his post-hoc efforts to contradict the District Court's findings speaks volumes about his intent.

Nevertheless, Juravin claimed customers saw the terms five times before purchase.  Yet, of those five times, not one occurred prior to a customer paying for the products.  Trial Tr. 8/17/20 at 133:3-134:22.  Juravin identified instances like a post-purchase email, post-purchase text message, and warnings placed on the box shipped to customers (that they obviously received post-purchase).  Trial Tr. 8/17/20 at 134:10-22.

Juravin had a lawyer draft a letter to send to customers who allegedly violated Roca Labs' terms.  Trial Tr. 8/17/20 at 143:13-18.  Juravin included a copy of the form letter the lawyer prepared in his written discovery responses in the Enforcement Action.  PX 161, Ex. C. Also in those written responses, Juravin identified numerous individuals who received the lawyer's letter.  PX 161 (Response to Rog. 7).  In the letter, customers were threatened with a variety of legal actions, from the filing of a police report against the customer for illegal extortion, actions asserting defamation or slander claims, and damages claims in the "hundred of thousands of Dollars."  PX 161, Ex. C.  While Juravin tried at trial to skirt answering whether he approved of this letter, he stated the attorneys who wrote it were "approving my – my – what I wanted, not the other way around."  Trial Tr. 8/17/20 at 145:20-24.  Ms. King confirmed Juravin's hard stance on customers who complained.  She often handled "difficult customers" and sometimes received instructions from Juravin that she should threaten them.  King Tr. at 46:20-47:17 (ECF No. 61-1).  In his written, sworn discovery responses, Juravin stated the threatening letter went to customers who contacted Roca Labs with "refund demands or threats

to sue Roca Labs based on alleged non-performance of the Roca Labs regimen.  We responded

to all of these communications with a form template email," which was Exhibit C to the

response.[18]  PX 161 (Response to Rog. 7).  Juravin attempted to back away from his written

statement, claiming he was "just fine tuning" in claiming that not all who demanded a refund

received the threatening letter.  Trial Tr. 8/17/20 at 147:7-149:14.

Juravin stated one of the reasons he sought to suppress negative comments was:  "If a

customer is already in the process of losing 100 pounds and they see a review saying, oh, it's all

bull, or it's all, you know, not real, it will influence them badly psychologically.  They will stop

believing in that.  And that's what I try to prevent."  Trial Tr. 8/18/20 at 40:3-41:16.  Yet,

Juravin's prior testimony shows another concern was lost sales.  PX 135 (2/15/17 Depo. Tr.) at

55:3-62:7.

To combat the negative reviews, Juravin even encouraged success coaches to post

positive reviews, such as on the Better Business Bureau's site.  Trial Tr. 8/17/20 at 118:7-21.  He

did not, however, tell those paid coaches to state in their review that they worked for Roca Labs.

Hensley Tr. at 135:21-137:8 (ECF No. 61-2); King Tr. at 227:5-228:2 (ECF No. 61-1).  Juravin

also encouraged Ms. Hensley to make positive comments on the Roca Labs Facebook page.

Hensley Tr. at 138:13-139:11 (ECF No. 61-2).  Based on his comments to her posts, including

those on platforms other than Facebook, Ms. Hensley understood that Juravin saw and read her

comments.  Hensley Tr. at 139:19-140:10 (ECF No. 61-2).  She was not given any instructions

about whether to disclose her affiliation with Roca Labs in those posts.  Hensley Tr. at 139:12-16

(ECF No. 61-2).

---

[18] The FTC issued the written discovery requests to Juravin – not one of the entities named in
the Enforcement Action.  PX 161.  Juravin signed the responses under the penalty of perjury.  PX
161 at 15.

**D.  Juravin Is Not Credible.**

At trial, the number of times Juravin contradicted or tried to shift away from his prior

sworn statements was dizzying.  Juravin repeatedly and consistently attempted to explain away

prior statements he made under oath, as if he only understood the question previously asked once

he understood how the FTC intended to use his statements against him.  Whether he made those

statements orally or in writing, his conduct at trial was remarkably consistent:  none of the words

he chose actually meant what he said.

For example, Juravin previously testified that he was responsible for decisions about

advertising for Roca Labs.  PX 135 (2/15/17 Depo. Tr.) at 15:15-19.  Then, at trial, he claimed he

made those decisions in consultation with others.  Trial Tr. 8/17/20 at 29:7-30:2.  Later, he

claimed the medical director was also responsible for checking claims on the website.  Trial Tr.

8/18/20 at 8:11-8:15.  Then, he took that back when he admitted he did not recall asking Dr.

Finesmith to check the website.  Trial Tr. 8/18/20 at 13:12-16.

Juravin also tried to distance himself from the claims made in Roca Labs' website and

ads.  He claimed both that it did not matter what he said on the website (Trial Tr. 8/17/20 at

174:12-22), that he did not intend to actually sell products with Roca Labs' advertisements, but

to present an "option" to consumers (Trial Tr. 8/18/20 at 26:23-27:2), and that the claims on the

website were just "points for discussion."  Trial Tr. 8/18/20 at 59:12-60:2.  Yet Juravin spent

*twelve million dollars* on advertising during the relevant period.  PX 137 (2/17/17 Depo. Tr.) at

445:24-447:11.  It takes extraordinary effort to believe any of Juravin's statements on these

issues.

At trial, Juravin repeatedly claimed that there were times where he offered products to

consumers for free.  Trial Tr. 8/17/20 at 106:5-107:5, 114:6-15, 170:15-171:15; Trial Tr. 8/18/20

at 22:1-11.  However, when asked at his deposition whether anybody received anything for free, or on a complimentary basis, he made clear that only Priscilla Laporte did, and she was the only exception.  PX 137 (2/17/17 Depo. Tr.) at 565:7-566:5.

Several other inconsistencies, contradictions, and attempts to parse clear queries are included in the facts outlined above.  Why the Court should believe his sworn testimony at trial, as opposed to that given previously under oath remains a mystery.  He either did not testify truthfully during the FTC's Enforcement Action, or did not do so at the trial of this adversary proceeding.  Neither outcome establishes his testimony was truthful.  However, it does establish that Juravin is not credible.

## III.    JURAVIN INTENDED TO DECEIVE CONSUMERS SO THE FTC'S DEBT SHOULD BE EXCEPTED FROM DISCHARGE.

Proving a debtor's subjective intent to deceive is notoriously difficult in many circumstances.  As a result, fraudulent intent, as an issue of fact, need not be shown by direct evidence but may be inferred from the totality of the circumstances.  *Smith v. Cravey (In re Cravey)*, 105 B.R. 700, 703 (Bankr. M.D. Fla. 1989) (finding the "misrepresentation and nondisclosure of material facts, coupled with their deceptive conduct… establishes the fraudulent intent of the defendants, under the totality of the circumstances").  An analysis determining fraudulent intent often "depends largely upon an assessment of the credibility and demeanor of the debtor."  *J. Thompson Invs., LLC v. Soderstrom (In re Soderstrom)*, 524 B.R. 835, 841 (Bankr. M.D. Fla. 2015); *see also Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir. 1994).  Actual fraud to exclude a debt from discharge "'consists of any deceit, artifice, trick, or design involving [the] direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.'"  *Conseco v. Howard (In re Howard)*, 261 B.R. 513, 517 (Bankr. M.D. Fla.

2001) (quoting *McLellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)).  Evidence supporting a fraudulent purpose can include "conduct specifically and intentionally designed to mislead or deceive."  *Kolb v. Bentley (In re Bentley)*, 599 B.R. 369, 384 (Bankr. M.D. Fla. 2019).  Intent to deceive exists where there was a "pattern of misrepresentation, there are similar statements made to multiple parties, [and] there is persistence in continuing deceit…."  *FTC v. Ettus (In re Ettus)*, 596 B.R. 405, 412 (Bankr. S.D. Fla. 2018).  Ultimately, the FTC's burden of proof on intent is by a preponderance of the evidence.  *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).  In other words, the FTC need only show it was more likely than not that Juravin intended to deceive consumers.

The amount of control and involvement a debtor has over the deceptive conduct is important in the intent analysis.  For example, debtor has the requisite intent to defraud when he "actively and knowingly participated in a fraudulent scheme, induced consumers to retain …services under false pretenses, and recklessly disregarded deceptive statements made by his telemarketers."  *Ettus*, 596 B.R. at 411-12; *FTC v. Rensin (In re Rensin)*, 597 B.R. 177, 186 (Bankr. S.D. Fla. 2018) (finding debtor "is responsible for the entire harm brought to bear on BlueHippo's customers, not just because the district court held him liable under the contempt order, but because he himself was responsible for the fraud").  Juravin's control of the claims, and participation in both creating the deceptive claims and disseminating them shows he actively and knowingly participated in the fraudulent scheme.

A finding that a debtor intended to deceive can also rest upon proof of a debtor's reckless behavior, under the totality of the circumstances.  *Soderstrom*, 524 B.R. at 841.  Likewise, "'[r]eckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference [sic] of intent [to

deceive].'"  *Miller*, 39 F.3d at 305 (*quoting In re Albanese*, 96 B.R. 376, 380 (Bankr. M.D. Fla.

1989)).  Similarly, intent to deceive may be found based upon the volume and pattern of a

debtor's misrepresentations.  *In re Sears*, 533 F. App'x 941, 945 (11th Cir. 2013).

Ultimately, this exception to discharge is meant to ensure that only the "'honest but

unfortunate debtor' is afforded a fresh start."  *Miller*, 39 F.3d at 304.  Thus, courts have found

intent to deceive when the evidence "leaves no plausible honest explanation for the debtor's

action."  *In re Laskey*, 441 B.R. 853, 856 (Bankr. N.D. Ohio 2010); *Ettus*, 596 B.R. at 411

(finding there was no other plausible honest explanation for debtor's "failure to disclose material

information…, [and] knowing inclusion of false information in sales scripts").

Finally, in this Circuit, a debtor must benefit from his fraudulent conduct.  *HSSM #7 Ltd.

P'ship v. Bilzerian (In re Bilzerian)*, 100 F.3d 886 (11th Cir. 1996).  Juravin absolutely benefited

from the fraud here – raking in $7 million from this deceptive enterprise.  *Roca Labs*, 345 F.

Supp. 3d at 1400 ("Juravin controlled RLI, personally receiving $7 million from the Corporate

Defendants during this timeframe").

The evidence shows conclusively that Juravin actually intended to deceive consumers.

Alternatively, if the Court does not find sufficient evidence of *actual* intent to defraud, Juravin

was, at minimum, reckless in making the claims at issue.  Juravin made claims about the central

characteristics and efficacy of Roca Labs products that he knew he could not support.  He did

this to sell products, and thereby obtain more of the benefits for himself.  His attempts in his trial

testimony to explain psychology as a basis for his claims were non-scientific bunk.  Juravin also

promoted the Roca Labs products using video "testimonials" for which he wrote the script, and

that featured actors who had never used the products – never disclosing those key facts to

consumers.  He also featured the testimonial video recorded by a Roca Labs success coach, and

did not disclose that at the time she recorded the video, she was being paid by Roca Labs.  In

addition, Juravin created a purportedly independent website that he knew would have the effect

of promoting the only products mentioned on it:  those sold by Roca Labs.  Finally, Juravin

actively sought to suppress negative comments about Roca Labs products by inserting terms

purporting to bind consumers to a gag clause, and then sending letters threatening lawsuits

against customers who posted negative comments.  Juravin did not lack purpose or knowledge in

taking all of these actions.  They were intentional acts for which there is no plausible honest

explanation.  This is not the conduct of an innocent debtor; but it is exactly how one who

actively seeks to deceive customers to purchase products conducts himself.  Juravin's incredible

protestations to the contrary do not overcome the weight of evidence in this case:  Juravin

intended to deceive consumers.

### A. Juravin Knowingly Made False, Misleading, or Unsubstantiated Claims About Roca Labs' Products.

The District Court has already found that Juravin made claims that were both false and

deceptive.  *Roca Labs*, 345 F. Supp. 3d at 1388.  Further, it held Juravin controlled virtually

every aspect of Roca Labs, that he knew of the material misrepresentations, and either had

participated in the deception or had the authority to control it.  *Id.* at 1400.  The evidence elicited

at trial bolsters those findings.  Juravin controlled the marketing of and claims made about Roca

Labs products, and he has admitted responsibility for the claims.  Trial Tr. 8/17/20 at 29:1,

34:20-24.  In developing the marketing and websites for the Roca Labs products, Juravin chose

to make certain claims.  As the District Court found, those claims – involving health – were

material.  *Roca Labs*, 345 F. Supp. 3d at 1386.  Those claims included statements that the

products were "scientifically proven" to have a certain effect; they caused the user to decrease

his food intake and lose substantial amounts of weight; the products were comparable or superior

to bariatric surgery; and that the products were safe for use by children.  PX 6-9, 15, 20-21, 45,

53-54, 56, 60-61, 64, 67, 84, 86, 88, 94-95, 106, 110.  When Juravin chose to make these claims,

he knew he did not have evidence to show they were "scientifically proven," nor did he have any

organized data *about the products themselves* to show their efficacy.  His conduct was

intentional, or at a minimum, reckless.

Juravin's own statements prove the extent of his purposeful deception.  As he has

explained, he could not be honest with his customers – he needed to trick them into believing the

products produced a sense of fullness, and that if they followed a series of restrictive "rules"

(rules he actively disclaimed on the Roca Labs website and in educational videos) they would

lose weight.  *See supra* pp. 18-20.  Juravin knew the formula would not stay in one's stomach for

10 to 16 hours.  PX 137 (2/17/17 Depo. Tr.) at 544:20-25.  Juravin also knew he could not tell

customers he was effectively placing them on a restricted diet that included fasting for 16 hours

each day.  PX 137 (2/17/17 Depo. Tr.) at 542:18-544:25.  Yet, that is what he claims he sold as

his "regimen."  Selling a product by telling customers you are selling one thing, while knowing

your product does not actually work in the manner and method described (or does not work

without a bunch of additional rules you have disclaimed) absolutely is intent to deceive.

Juravin knew he did not have scientific evidence or formal studies of any kind to

substantiate the claims he made about the Roca Labs products.  *See supra* pp.12-17.  Dr.

Finesmith recommended that Juravin obtain such a study, Mr. Choksi provided referrals of

places that could conduct the studies, but Juravin never heeded Dr. Finesmith's advice.

Finesmith Tr. at 63:10-66:23 (ECF No. 61-3); Trial Tr. 6/26/20 at 67:6-16; Trial Tr. 8/17/20 at

58:8-16.  Instead, Juravin now posits that scientific evidence could come from claims made on

social media about the products' efficacy.  Trial Tr. 8/17/20 at 65:1-14, 66:7-11.  But, the social

media "evidence" is not actually an improvement over his original claim that he made claims based upon user feedback that he obtained third hand.  *See supra* pp. 12-16.

Further, Juravin knew he advertised a product he called an alternative to gastric bypass, that included no diet or menu restrictions.  Trial Tr. 8/17/20 at 34:20-24 (admitting responsibility for claims made on website).  Yet, after disclaiming that the products came with restrictions, he saddled customers with a litany of extra "rules" that they must strictly abide.  Trial Tr. 8/17/20 at 82:17-86:23; *e.g.*, PX 80, 155 (FTC-PROD-004542), and 8, 49, 52, 99.  Some of those rules, as explained by Juravin, are remarkable – one must:  restrict caloric intake to 1,200 calories per day; not eat food until four hours after waking; eat measured portions, chew each bite for 20 seconds, then wait another 30 seconds before taking the next bite, and after 8-9 bites evaluate if you are full; not eat greasy food, dairy, or drink coffee; exercise consistently; and drink three liters of water each day.  PX 137 (2/17/17 Depo. Tr.) at 555:4-557:24.  Juravin attempts to explain all of these rules away by claiming he was selling a "regimen," not just supplements.  But, that is not what the claims he approved on Roca Labs' websites stated.  *E.g.*, PX 88 (what is gastric bypass alternative?); PX 17, 97, 103, 133 (images of products offered for purchase); PX 7, 53, 67, 84, 95 (all referring to rules stated as "recommended rules for suggested use); PX 8, 49, 52, 80, 99, 155 (FTC-PROD-004542) (all claiming no menus, no diet restrictions).  His latest attempt to say, in essence, that the entire history of litigation, indeed the FTC and a District Court, misunderstood what he was selling speaks loud and clear about his intent in selling the Roca Labs products without substantiation.

Further, one of the core claims – that the Roca Labs products were safer and more effective than gastric bypass surgery – was not supported by any real data, let alone studies or science.  His asserted support came from general research on the Internet, and conclusions he

drew from it.  PX 137 (2/17/17 Depo. Tr.) at 552:14-553:11.  Juravin also claimed that because

the products included an anti-cravings mix, his products were superior to surgery, which he

believes does not help with cravings.  Juravin 551:9-552:13.  Like several other claims, Juravin

testified that some of his support came from customers.  Trial Tr. 8/17/20 at 76:14-77:21.

There is a glaring problem in relying on customer feedback for some of the establishment

claims at issue:  none of the supposed customer feedback that Juravin relied upon was organized

or collected in a formal way.  Trial Tr. 8/17/20 at 51:3-25.  Moreover, at least one of the

individuals he relied upon for that feedback spent 90 percent of her time talking with *prospective*

customers, not existing ones.  Hensley Tr. at 214:22-215:6, 225:25-226:23 (ECF No. 61-2).

Juravin's general sense of customers' successes, obtained third hand, did not actually establish

anything, yet he maintains his claims were supported by results.  Trial Tr. 8/17/20 at 50:8-15.

Whether it's called supposition, conjecture, or surmise, it is not scientific nor is it actual

substantiation for any of the claims.

Alternatively, in making the claims at issue without actual proof to back them up, Juravin

was reckless.  Juravin chose to make the claims at issue; if the Court finds he did so without

regard to whether he had the appropriate level of substantiation, or any substantiation, that

constitutes reckless disregard for the truth or falsity of the claims.  This kind of recklessness

suffices for intent to deceive under Section 523(a)(2)(A).  *Soderstrom*, 524 B.R. at 841.  When

Juravin's reckless conduct is combined with the widely disseminated claims about central

characteristics of the products, a finding of recklessness supporting intent to deceive is

appropriate.  *Miller*, 39 F.3d at 305 (*quoting In re Albanese*, 96 B.R. 376, 380 (Bankr. M.D. Fla.

1989))

Although Juravin stated he "went above and beyond" by hiring a medical director, the medical director he hired had no relevant specialized experience, something the initials indicating his medical degree do not cure.  That medical director, Dr. Finesmith, specialized in pediatric neurology.  Finesmith Tr. at 15:2-11 (ECF No. 61-3).  Dr. Finesmith had nothing to do with product formulation, never knew what proportions of ingredients were in Roca Labs' products, never monitored the claims made on the websites, and resigned in 2013.  Finesmith Tr. at 27:22-24, 208:5-17, 31:6-8, 21:12-18 (ECF No. 61-3).  That medical director did make one very specific recommendation to Juravin:  that Roca Labs have a clinical study performed on its products.  Finesmith Tr. at 63:10-66:23 (ECF No. 61-3).  Juravin, however, never acted on that recommendation.

Hiring someone with a degree that seemingly fits, but who lacks experience or expertise in weight loss or nutrition does not support a finding of innocent intent.  If anything, it shows Juravin was willing to go only so far as to hire someone with "M.D." attached to his name, but whose experience and expertise would not cause him to get in Juravin's way on product development or marketing.  It is a smoke screen that confirms his intent to deceive, rather than refutes it.

**B. Juravin Approved Roca Labs Use of Testimonial Videos Recorded by Persons Who Had Undisclosed Financial Relationships With Roca Labs.**

Juravin promoted Roca Labs, in part, through videos of purported satisfied customers. Several of the videos were shot using paid actors, and others featured individuals who claimed to have used the products.  Trial Tr. 8/17/20 at 101:10-25, 105:22-110:14; King Tr. at 192:3-193:4, 200:5-201:7, 203:12-204:9, 207:14-208:5, 209:20-210:15 (ECF No. 61-1); Hensley Tr. at 227:7-230:2 (describing diet and exercise changes she made while using Roca Labs' products); *e.g.*, PX 6.  Both types of video testimonials featured persons who were paid by Roca Labs, but that fact

was not disclosed to viewers of the videos.  *Roca Labs*, 345 F. Supp. 3d at 1382; Trial Tr. 8/17/20 at 105:22-110:14.  In addition, Juravin requested various persons who worked for Roca Labs to write positive reviews of the products, but did not have them disclose their relationship to Roca Labs in those reviews.  *Roca Labs*, 345 F. Supp. 3d at 1382.  The District Court found that the failure to disclose the financial relationships with the testimonialists and those who posted reviews while working for Roca Labs involved material misrepresentations about health matters and information important to customers' ability to make informed decisions about whether to buy Roca Labs' products.  *Id.* at 1390.

During his testimony, Juravin conceded that several videos on Roca Labs websites featured paid actors who were not actually customers of Roca Labs.  Trial Tr. 8/17/20 at 105:22-110:14.  Juravin also admitted that he wrote the scripts for these videos.  Trial Tr. 8/17/20 at 105:18-21.  Although Juravin claimed the actor-recorded videos appeared only in the early years of Roca Labs' sales activities, at least five of them continued to appear on the "reviews" section of the Roca Labs website in 2015 (PX 14, 26, 89), the last year at issue.  Attempting to distance himself from those facts, Juravin asserted that prospective customers would be able to tell which videos were recorded by actual users of the products, as opposed to those recorded by paid actors who had not actually used the product.  Trial Tr. 8/18/20 at 23:19-24:6, 24:9-15.  Juravin could not explain how that would be apparent to a *prospective* customer visiting the Roca Labs websites and reviewing these videos.  Trial Tr. 8/17/20 at 117:2-8.  As Juravin admitted, the paid actor videos did not include disclaimers, either in the video or below its thumbnail, indicating the person featured in the video did not actually use the products and that she was paid to record the video.  Trial Tr. 8/17/20 at 107:12-110:17; PX 7, 14, 26, 89.  By knowingly promoting video testimonials and success stories of asserted satisfied customers, but which featured persons who

43

had not actually used the products, and who were paid for their work, Juravin intended to deceive consumers.

In addition, two other videos featured as success stories were recorded by two success coaches.  The two individuals worked for Roca Labs, but they did not disclose that fact in the videos.  *Roca Labs*, 345 F. Supp. 3d at 1389 ("Purportedly satisfied customers – 'Carla' and 'Roxie' – depicted in the videos posted on RocaLabs.com were actually Defendants' employees.").  Juravin included no information about the financial relationship between "Carla" and "Roxie" and Roca Labs on the pages where the videos appeared, nor did he direct them to disclose it in their videos.  PX 83, 6, 7, 102.  The failure to disclose material information about this key relationship is enough to find Juravin intended to deceive consumers.  Alternatively, if the Court finds Juravin did not know about their employment status at the time the videos were recorded – an unbelievable proposition – he acted recklessly in not requiring "Carla" and "Roxie" to disclose their financial relationship with Roca Labs in their testimonials.

In addition to the testimonial videos, Juravin also directed individuals who worked for Roca Labs to post positive reviews of the products on third party sites, and Roca Labs' own sites, again without directing them to disclose their relationships to Roca Labs.  Hensley Tr. at 93:10-94:3, 136:2-137:8, 138:13-140:7 (ECF No. 61-2); PX 136 (2/16/17 Depo. Tr.) at 245:12-246:12.  Sometimes the reviews were posted under fictitious names, and Juravin knew that.  *Roca Labs*, 345 F. Supp. 3d at 1389 ("Roca Labs General Manager Sharon King ('King') testified that she wrote a Roca Labs product review under the name of 'Fran,' which was a fictitious name, and that Juravin edited the review").  Juravin also encouraged Ms. Hensley to post reviews on pissedconsumer.com, on the Better Business Bureau's site because "there was so much negativity," and on Roca Labs' Facebook page.  Hensley Tr. at 93:10-94:3, 136:2-137:8, 138:13-

140:7 (ECF No. 61-2); *see also Roca Labs*, 345 F. Supp. 3d at 1389 (finding Ms. Hensley was

asked to post positive comments about Roca Labs monthly on Facebook and did not state her

association with Defendants).  As the District Court noted, Juravin also directed Ms. King to

instruct "the Customer Service people" to write posts or reviews and comment on Roca Labs

Facebook advertisements, but he did not say to instruct the employees to disclose their affiliation

with Roca Labs.  *Roca Labs*, 345 F. Supp. 3d at 1389.  There is no innocent purpose behind

flooding third party sites and Roca Labs' social media pages with positive reviews written by

persons being paid by the company they are promoting.  In not instructing Roca Labs team

members to disclose their affiliation with the company, the end result was to create and inflate

the appearance of a successful product.  Juravin's conduct becomes all the more egregious and

duplicitous when considered with the fact that he actively suppressed negative comments.  These

are actions borne of deceit, not of innocent purpose.

### C.  Juravin Intentionally Did Not Disclose That He Owned and Operated Gastricbypass.me.

Juravin has admitted he did not disclose the relationship between gastricbypass.me and

Roca Labs.  He created gastricbypass.me to "educate and scare people about" gastric bypass

surgery.  *Roca Labs*, 345 F. Supp. 3d at 1389.  Only Roca Labs products were discussed

favorably on the site.  *Id.*  Juravin also conceded he did not see any value in telling consumers

Roca Labs was behind the gastricbypass.me site.  *Id.*  The District Court found these purposeful

omissions of material information deceptive.  *Id.* at 1390.  Thus, in creating a supposedly

independent third party site, and failing to disclose the site's affiliation with company that

produced the only products featured on the site, Juravin intended to deceive consumers.  No

innocent purpose lies behind this conduct – gastricbypass.me was just another way to advertise

and promote Roca Labs products, and consumers had no way of knowing that.

**D.  Roca Labs Products Purchasers Did Not Affirmatively Agree To Pay The Difference Between A Purported "Discount" Price And A Purported "Full Price" If They Posted Negative Product Comments or Reviews.**

Consumers seeking to purchase the Roca Labs products were not forced to read the terms and conditions for the website prior to completing their purchase.[19]  At the end of the order process, consumers were required to check a box next to a statement that said the customer has read the terms and conditions, among other things.  PX 133.  Checking that box did not create a requirement that either:  (a) the consumer first have visited the terms and conditions page through a link redirect; or (b) the consumer review the terms in a pop-up window triggered by checking the box.  Trial Tr. 8/17/20 at 133:3-137:3.  Juravin did not otherwise highlight on the Roca Labs websites that customers were prohibited from posting negative reviews of the products.  *Roca Labs*, 345 F. Supp. 3d at 1391-92.  Although Juravin claims Roca Labs sent an email to purchasers and highlighted that specific condition, that email was sent *after* the customer had purchased the products.  Trial Tr. 8/17/20 at 133:3-134:22.

Juravin claimed that the terms and conditions notified customers that if they posted negative reviews of Roca Labs products, they agreed to pay the difference between the "full price" and the purported discounted price charged for the products.  Trial Tr. 138:4-7, 140:18-141:1; PX 59, 101, 124-127.  The District Court has already disagreed.  *Roca Labs*, 345 F. Supp. 3d at 1391-92.  The purchase process on the Roca Labs website did not include an option for a customer to purchase the Roca Labs products at "full price" to avoid the gag clause.  PX 133.  The District Court found that the price of the product did not include references to a discount or concessions for publishing negative comments.  *Roca Labs*, 345 F. Supp. 3d at 1391.  Juravin did

---

[19] The District Court first found that Defendants' created a net impression that the products did not include concessions about publishing negative comments.  *Roca Labs*, 345 F. Supp. 3d at 1391.  It also held although the terms and conditions were disclosed via hyperlinks, it was unlikely consumers would have noticed or clicked on the link.  *Id.* at 1392.

not disclose anything about a price-related gag clause concession in the product cost page (PX 17, 97, 103), or in any of the numerous banner ads he ran promoting the products (PX 118-121). The District Court found claims about the products' price and limitations on what customers could say about them was material because it related to important information to customers – the price of the product. *Roca Labs*, 345 F. Supp. 3d at 1392-93.

Juravin knew that information related to the products' cost was material to his consumers. He testified repeatedly that "his customers" had to save for months to be able to purchase the Roca Labs products.  Trial Tr. 8/17/20 at 174:15-22, 183:14-21; Trial Tr. 8/18/20 at 26:4-8, 59:4-8, 60:6-15.  Thus, his own statements show the importance of this term to his customers.  In hiding the terms related to the gag clause in a hyperlink that led to lengthy terms and conditions, he did not actually intend to inform or warn customers of those conditions prior to their purchase.  Quite the opposite.  The fact that the gag clause is not mentioned prominently on any other product information pages is also telling.  It leads to only one conclusion:  Juravin did not actually want customers to know about those terms in advance.  Yet, he did want to enforce the terms against customers if they were unhappy and posted negative comments.

For customers who did post negative comments, or request a refund because the product did not work, Juravin sent a standard letter in response.  PX 161 (Response to Interrogatory 7 and Ex. C).  In that letter, Roca Labs threatened it might file a police report against consumers; that they could be forced to defend defamation claims; and that they could face a claim for damages in as high as six figures.  PX 161 (Ex. C).  The District Court noted that several customers received threatening letters. *Roca Labs*, 345 F. Supp. 3d at 1394-95.  Through those letters, Juravin accomplished his goal – the customers removed the negative posts out of fear of a lawsuit. *Id*.  The District Court found "Defendants admittedly suppressed negative information

about the products." *Id.* at 1395.  In suppressing negative comments, threatening consumers with police reports and lawsuits, and in claiming they had agreed to terms that he buried in a lengthy terms and conditions page, Juravin did not act without purpose.  He acted with intent to deceive.  His conduct had the effect of inflating consumers' perspective of the relative success of Roca Labs products, which then allowed Juravin to sell more products.  Juravin's conduct was not mere recklessness either – he knew the impact negative comments could have on Roca Labs' success.  PX 135 (2/15/17 Depo. Tr.) at 61:25-62:7.  His solution was to suppress the negative comments and claims of customer dissatisfaction.  Juravin's actions were purposeful, intentional, and deceptive.

## IV.    CONCLUSION

The evidence shows that Juravin's deceptive conduct was intentional.  He had full control over all of the claims at issue, and every time chose to make duplicitous claims.  Even if the Court finds some of those choices were borne of reckless rather than intentional conduct, the result is the same:  a finding of intent to deceive under Section 523(a)(2)(A).  Juravin offered no credible testimony at trial to overcome the vast evidence proving his intent.  The volume of the claims made, plus the repeated and consistent misrepresentations lead to only one conclusion:  Juravin intended to deceive consumers in marketing and selling Roca Labs products.  *In re Sears*, 533 F. App'x at 945 (debtor's repeated and consistent misrepresentations were sufficient to establish his intent to deceive).  It is hard to imagine a clearer case of "something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *In re Howard*, 261 B.R. at 517.  Thus, the FTC respectfully requests that this Court find its $25,246,000 judgment is excepted from Juravin's discharge under Section 523(a)(2)(A).

Dated:  September 18, 2020                     Respectfully submitted,

                                               /s/ Kimberly L.  Nelson
                                               Michael P. Mora (Ill. Bar No. 6199875)
                                               Kimberly L. Nelson (VA Bar No. 47224)
                                               Federal Trade Commission
                                               600 Pennsylvania Ave., NW, Mail Stop CC-9528
                                               Washington, D.C. 20580
                                               Telephone: (202) 326-3373; -3304(Nelson)
                                               E-Mail:  mmora@ftc.gov; knelson@ftc.gov

                                               *Attorneys for Plaintiff Federal Trade Commission*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing *Federal Trade Commission's Written Closing Argument* was served via ECF Notice to counsel for Defendant Don Karl Juravin and any other registered ECF user participant in this adversary listed below on September 18, 2020.

Dated:  September 18, 2020                     /s/ Kimberly L.  Nelson

*Via ECF Notice*
To:  aldo@bartolonelaw.com; aldo.bartolone@gmail.com; aldo@ecf.courtdrive.com;
     erin@bartolonelaw.com
Aldo G. Bartolone, Jr., Esq.
Bartolone Law, PLLC
1030 N. Orange Avenue, Suite 300
Orlando, Florida 32801
Counsel for Defendant

49