UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Case No. 6:18-bk-6821-KSJ |
| | ) | |
| DON KARL JURAVIN, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 6:19-ap-00030-KSJ |
| | ) | |
| DON KARL JURAVIN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT, DON KARL JURAVIN'S**
**POST-TRIAL BRIEF**

The Defendant, DON KARL JURAVIN ("Juravin"), by and through undersigned counsel, hereby files his Post-Trial Brief, and further states as follows:

**Introduction**

A trial was held on the Plaintiff, Federal Trade Commission's Complaint to Determine Nondischargeability of Debt (the "Complaint") (Doc. No. 1) and Defendant, Don Karl Juravin's Answer and Affirmative Defenses (the "Answer") (Doc. No. 4) on June 26, 2020, August 17, 2020 and August 18, 2020. The Federal Trade Commission ("Plaintiff" or "FTC") filed a five-count complaint, each count alleging an exception from discharge of the same debt under 11 U.S.C. § 523(a)(2)(A). The Debtor/Defendant, Don Karl Juravin ("Debtor" or

1

"Juravin"), in his Answer, denied the material allegations in the Complaint and asserted three affirmative defenses.

Once the pleadings were closed, the FTC filed a Motion for Summary Judgment (Doc. No. 15) and Juravin filed his Response and Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 22). On March 22, 2020, the Court entered an Order Partially Granting and Partially Denying Plaintiff's Motion for Summary Judgment (the "Summary Judgment Order") (Doc. No. 34). The Summary Judgment Order made the following findings: (1) the debtor made a false representation, (2) the creditors/customers relied on the misrepresentation, (3) reliance was justified, and (4) the creditors/customers sustained a loss because of the misrepresentations. However, the FTC was unable to establish, through record evidence, that the Debtor acted with the intent to deceive. Therefore, the trial in this case proceeded on the sole issue of whether Juravin acted with the intent to deceive.

The FTC did not introduce any new evidence or testimony that was not a part of their Motion for Summary Judgment and they did not meet their burden of proof. The FTC failed to introduce any evidence that the Debtor had the requisite intent to deceive. Therefore, the Court should enter judgment in favor of the Debtor, declaring the debt owed to the FTC dischargeable.

## Legal Issues & Standards

The burden of proof in non-dischargeability actions is upon the plaintiff to show by a preponderance of the evidence that a discharge is not warranted. *Grogan v. Garner*, 498 U.S. 279 (1991). "A preponderance of the evidence standard applies to all exceptions from dischargeability contained in Section 523(a) of the Bankruptcy Code." *First USA Bank v.*

*Hunter (In re Hunter)*, 210 B.R. 212, 214 (Bankr. M.D. Fla. 1997).  "**Exceptions to discharge are to be construed strictly in favor of the debtor**." *Id*. at 214 (emphasis added).

The sole issue on which the trial proceeded, was whether the Debtor harbored the requisite intent to deceive when he made certain representations regarding the weight loss product and regimen.

> To prove an intent to deceive, "the debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in the law, which may exist without the imputation of bad faith or immorality."

*They Might Be, Inc. v. Carter (In re Carter)*, 593 B.R. 354, 361 (Bankr. M.D. Fla. 2018) citing *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir. 1986) (abrogated on other grounds by *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d. 755 (1991)).

In making the determination whether a debtor acted with the intent to deceive, the Court should consider "the recklessness of a debtor's behavior." *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301 (11th Cir. 1994).  A statement is considered to be made in "reckless disregard of the truth if the speaker makes the statement without caring about whether the representation is true or false." *DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 171 (10th B.A.P. 2012).  "This must be distinguished from a speaker who negligently makes a false representation but honestly believes the representation to be true—which is not sufficient to prove intent to deceive." *They Might Be, Inc. v. Carter (In re Carter)*, 593 B.R. 354, 361 (Bankr. M.D. Fla. 2018).  "**If there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor**." *Gaft v. Sheidler (In re Sheidler)*, 2016 Bankr. LEXIS 952, 2016 WL 1179268, *5 (6th B.A.P. Mar. 28, 2016) (emphasis added).

**Trial Testimony**

The Debtor called three live witnesses to testify at the trial of this matter, to wit: Dr. Marcus Free, Tejas Choksi and Don Karl Juravin. Two additional witnesses were tendered via deposition testimony, to wit: Elizabeth Ulloa and Priscilla Laporte.

**A.     Marcus Kyle Free, MD**

Dr. Free was the first witness to testify at the trial on June 26, 2020. Dr. Free is a retired bariatric surgeon who now operates a medical weight loss practice. He was hired by the Debtor as a medical director for a weight loss program operated by the Debtor.

Dr. Free testified that his role as medical director was to "look at safety issues, to make sure that the best that we could that the ingredients for instance in the formula were things that were safe for a range of different people . . ." Trial Tr. 6/26/20 at 13:16-20. He went on to testify that they "were trying to fine tune from a safety standpoint as well as leading a clinical perspective." Trial Tr. 6/26/20 at 13:23-26.

As part of the Dr. Free's role with the Debtor's organization, he was required to contact members of the Facebook Group, at his choosing, and compile data reflecting the customers' experience with the products. Dr. Free stated that "I can tell you that the majority of the ones that I spoke to felt very highly about the program, were excited and happy about their weight loss and about how their quality of life had improved." Trial Tr. 6/26/20 at 18:14-18.

In addition to his fact-finding mission about the success of the Gastic Bypass Alternative product, Dr. Free had frequent interaction with the Debtor. Based upon his dealings with Juravin, Dr. Free "characterized him as being very passionate about helping people lose weight." Trial Tr. 6/26/20 at 27:14-15. He further testified that, referring to

Juravin, that "I think he almost feels like that this is sort of his mission in life is to help people lose weight in a safer way than what's out there." Trial Tr. 6/26/20 at 27:20-22.

Dr. Free's testimony is integral in demonstrating that the Debtor's intent in formulating, marketing and selling his gastric bypass alternative product was to help severely obese people reach a healthy weight without having to undergo a significant surgical procedure.

**B.     Tejas Choksi**

The second live witness to testify was Tejas Choksi, the Vice President of Natural Vitamins Laboratory Corp. in Miami, Florida.  Mr. Choksi holds a bachelor's degree in chemical engineering and master's degree in biomedical engineering from Florida International University.  Trial Tr. 6/26/20 at 48:3-7.

Natural Vitamins Laboratory Corp. is an FDA-certified facility that also has the GMP (Good Manufacturing Practices) certification.   Trial Tr. 6/26/20 at 49:4-9.   All of the ingredients purchased by Natural Vitamins Laboratory is required to conform with FDA specifications. Trial Tr. 6/26/20 at 50:7-11.  Natural Vitamins Laboratory has a practice of reviewing every order for the production of a supplement for the content and dosages of each item to make sure they are within regulations.  Trial Tr. 6/26/20 at 51:18-25.

Mr. Choksi started manufacturing the gastric bypass alternative product for the Debtor in 2013.  Trial Tr. 6/26/20 at 52:17-24.  The morning dose of the gastric bypass alternative regimen was made up of guar gum, xantham gum, beta-glucan, glucomannan or Konjac Inulin. Trial Tr. 6/26/20 at 53:6-10.  These products, together, gel up when mixed with water and make you feel full, which is why it was a weight loss product. Trial Tr. 6/26/20 at 53:16-20. Mr. Choksi reviewed the ingredients and dosages of the Debtor's products and they were fine. Trial Tr. 6/26/20 at 55:19-21.

He further testified that Juravin not only paid him to manufacture the product, but more importantly, to help him with the formulation. Trial Tr. 6/26/20 at 56:12-13. This was clearly a product that Juravin carefully, and with expert input, developed before placing it on the market.

Mr. Choksi testified that Juravin instructed him that he wanted everything to be the best quality ingredients. Trial Tr. 6/26/20 at 58:1-3.

**C.     Elizabeth Ulloa**

Elizabeth Ulloa testified via her deposition testimony that was given on February 22, 2017. Ms. Ulloa was a fact witness for Juravin in the District Court Litigation. She was a customer of the Roca Labs Gastric Bypass Alternative Product ("GBA"). She discovered the GBA by internet search, but then joined the Facebook Group for several weeks before deciding the purchase the regimen.

After purchasing the product, but before commencing its use, she searched for Google reviews of Roca Labs and called the Better Business Bureau. She found only one bad review of Google. She decided to use it.

Ms. Ulloa testified that the regimen came with specific instructions on its use. She was to eat the morning dose (gel) first thing in the morning. Two hours later she had to take an enhancement pill. Two hours after the pill she had her first meal of the day. Two hours after the meal she drank the Anti-Cravings solution. Two hours later she had to take the red pill/vitamin and two hours after that another drink of the Anti-Cravings solution. The last meal of the day was four hours before bedtime.

When she started using GBA, Ms. Ulloa weighed 250 pounds. In a period of four months, she lost almost 70 pounds. Her weight at the time of the deposition was 182 pounds.

Prior to using GBA, Ms. Ulloa had high blood pressure, high cholesterol, fatty liver and joint pain. All of her weight-related conditions subsided after successfully using the GBA.

Ms. Ulloa characterized Juravin as being a "hard ass" and showing "tough love." He would say discouraging things about the product to identify your sincerity in wanting to achieve a healthy weight. Juravin would tell Ms. Ulloa that the product tastes terrible to test her dedication. She stated that Juravin did not want people to waste their money. They should only buy the product if they were serious about losing significant amounts of weight at the cost of a very strict, and sometimes distasteful, product.

**D.    Priscilla Laporte**

Ms. Laporte was a user of the GBA and employee of Roca Labs. She was significantly overweight and had tried many other weight loss programs, including Weight Watchers and Jenny Craig. In using the GBA, Ms. Laporte lost 110 pounds.

Prior to using GBA, Ms. Laporte was prediabetic and suffered from seizures and migraines. After 6 months of using GBA, she not only lost a substantial amount of weight, but her medical conditions were under control.

Ms. Laporte was also a customer service representative for Roca Labs. She was involved in coaching the GBA users and assisting them with the instructions. She also had the ability to approve or deny sales of the GBA. On various occasions she denied sales because the prospective customer was not psychologically ready for such a strict regimen. Ms. Laporte was very clear with the potential and existing customers, telling them that the products were not a magic potion, but required dedication and hard work from the customer as well.

The Debtor also trained Ms. Laporte in using the Hub, which was the customized web page for each customer. Everyone has a customized regimen based upon factors such as age

and weight. She also coached customers through the Facebook Page. She interacted with almost 200 customers, or potential customers, per day to guide them through the process. Ms. Laporte was also in charge of dealing with customer complaints. They were very few, but most of them were shipping or payment related issues.

When asked about the Debtor, she stated the following:

> Don has been a lifesaver for me, not because he's my employer. Because I have things I can say. He's an asshole, he's a jerk at times, but his passion to help these people is what makes this regimen work.

Deposition Transcript at 47:1-6.

This testimony of Ms. Laporte really sums up why the nightmarish litigation of the FTC was instigated against Mr. Juravin. The Debtor can be a controversial and unlikeable character. However, that should not overshadow his passion to help obese people reach a healthy weight.

**E.    Don Karl Juravin**

The Debtor was the final witness to testify at the trial. He testified that the idea of the GBA came to him while living in Jerusalem in 2005. He encountered some people who had suffered significantly poor side of effects of gastric bypass surgery and imagined their had to be a safer, less-invasive way of assisting obese people in losing weight. Trial Tr. 8/17/20 at 151:14-25.

Over the course of his career in the weight loss industry with Roca Labs and thereafter, Juravin has helped over 90,000 people. There have been a whopping ZERO complaints about him or the product to the FTC and only 30 complaints to the Better Business Bureau. Trial Tr. 8/17/20 at 152:23-25. Only .003% of the entire customer base of Roca Labs has filed a formal complaint about the product or the company. However, the FTC has determined that Juravin

has committed fraud against all of his customers and sought to recover all of the earnings of Roca Labs over the period of 2011 to 2015[1].

Starting in 2010, Juravin hired Dr. Ross Finesmith, a medical doctor, to serve as his medical director for the GBA program. Since it was a dietary supplement, he was not required to have a medical director. However, Juravin wanted to produce a superior product. Dr. Finesmith revised the website content; revised the ingredients in the GBA; and collected data from a hospital in Saudi Arabia that was testing the product. Trial Tr. 8/18/20 at 8:9-25 & 9:5-17.

Mr. Juravin also testified that the average customer did not purchase from a one-time visit to the GBA website. Most of the customers would stalk the Facebook Group for five to seven months before buying GBA. Trial Tr. 8/17/20 at 174:15-16. The idea behind the Facebook Group was so that the customers would get reviews from existing customers before buying the product. Trial Tr. 8/17/20 at 175:1-3.

The GBA was typically purchased using a payment plan. Juravin allowed for customers to split the price into 3 payments. If the customer was unhappy with the product, they could simply cancel the future payments and keep the product, to boot.

Mr. Juravin also testified that the potential customers went through a screening process. Trial Tr. 8/18/20 at 15:20-25. Only 50% of the screening applications were approved. Juravin wanted to ensure that the purchasers were individuals who were dedicated to losing weight, and not someone looking for a magic pill.

---

[1] The U.S. Supreme Court has accepted two cases, from the 7th and 9th Circuit Courts of Appeal, where it was decided that the FTC should not be able to claw back all of the revenues of a company that is found to have violated the FTC Act. *Federal Trade Commission v. Credit Bureau Center LLC*, Docket No. 19-825.

The FTC tried to lay a foundation of fraud based upon two or three paid testimonials. In fact, the web pages that the FTC admitted into evidence contained dozens of real customer testimonials.

## Documentary Evidence

The FTC produced the same photos, screen shots, and videos that were produced in the District Court Litigation, without anything further.  What they failed to produce, because they do not exist, were any complaints to the Federal Trade Commission by an unhappy customer. They failed to produce any complaints to the Better Business Bureau claiming that they were defrauded by the Roca Labs products.  They failed to produce any lawsuits in which a customer claimed to have been harmed by the Roca Labs products.  They failed to produce any medical evidence that the Roca Labs products were falsely advertised or harmful to the public.

To the contrary, the only source of customer reviews we have is from Elizabeth Ulloa and Priscilla Laporte, whose depositions were admitted as evidence at the trial.  Both of these customers gave excellent reviews of the product.

The burden of proof in non-dischargeability actions is upon the plaintiff to show by a preponderance of the evidence that a discharge is not warranted. *Grogan v. Garner*, 498 U.S. 279 (1991).  The FTC has failed to meet their burden.

## Conclusion

Mr. Juravin should be entitled to a discharge of the District Court Judgment in favor of the FTC because he, in no way, intended to deceive his customers through his advertising and marketing.  In fact, he has a sincere belief that he is correct.  He demonstrated that conviction while testifying at the trial of this case.

The Debtor operated several entities that engaged in the business in selling weight loss products and coaching. The regimen, which included both the actual product and the coaching, was advertised as a safe and cost-effective alternative to gastric bypass surgery for people who were obese. Since the customers were losing the same or more weight using the product than having the surgery, then it is likely what it claims to be, which is effective.

The FTC has not made any allegations that the GBA was not a successful weight loss supplement nor were they able to produce one witness that complained about the GBA product or its price point. They used the same evidence that was presented in the District Court Litigation, without a single new addition. The allegations never changed. **However, they are asking the Court to find an intent to deceive without one person who felt deceived**.

Furthermore, the District Court never enjoined Juravin from selling the product. It is clear that neither the FTC nor the District Court considered the GBA a public threat or harm. They just did not like the way the product was marketed to the public. The FTC did not produce one witness who testified that the product was a scam. That is simply because it isn't. The GBA is a product that has been proven to work, merely by looking at the results of its customers.

If the Debtor truly harbored an intent to deceive his customers, he would not have spent the money on hiring a medical director, using the best ingredients and paying full time coaching and customer service assistants to help the customers with their weight loss. A true scam would have been a tub of baking soda claiming to be a weight loss product. The Debtor clearly produced, marketed and sold an actual and functional weight loss product. By definition of the word "alternative," the Roca Labs products were an alternative not just to gastric bypass surgery, but to all other weight loss products.

The Debtor respectfully requests this Honorable Court enter judgment in favor of the Debtor/Defendant and against the Federal Trade Commission, and allows the FTC Judgment to be discharged.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via Electronic Mail on Michael P. Mora, Esq. and Kimberly L. Nelson, Esq. of the Federal Trade Commission (mmora@ftc.gov & knelson@ftc.gov), this 18th day of September, 2020.

                         */s/ Aldo G. Bartolone, Jr.*
                         ALDO G. BARTOLONE, JR.
                         Florida Bar No. 173134
                         BARTOLONE LAW, PLLC
                         1030 N. Orange Ave., Suite 300
                         Orlando, Florida 32801
                         Telephone: (407) 294-4440
                         Facsimile: (407) 287-5544
                         E-mail: aldo@bartolonelaw.com
                         Attorney for Don Karl Juravin